**UNITED STATES of America, Plaintiff,**

**v.**

**Walter A. DURHAM, Defendant.**

**Cr. A. No. 90–36–JLL.**

United States District Court,
D. Delaware.

June 22, 1990.

Thomas V. McDonough, Asst. U.S. Atty., Wilmington, Del., for plaintiff.

Jerome M. Capone, Wilmington, Del., for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

This motion to suppress presents yet another version of the classic regret, "If I'd only known...."[1] In this case, if he had only known the charges were serious, the defendant would not have surrendered and confessed and would have instead eluded U.S. authorities by fleeing to Peru. Need-

---

**1.** *Cf. Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (Court rejects argument that waiver of *Miranda* rights not an "informed" waiver because defendant did not know attorney was trying to reach him); *Oregon v. Elstad,* 470 U.S. 298, 316–17, 105 S.Ct. 1285, 1296–97, 84 L.Ed.2d 222 (1985) (defendant unsuccessfully contended he might not have waived *Miranda* rights if he had known his previous statement would not be admissible); *United States v. Contreras,* 755 F.2d 733, 737 (9th Cir.) (Kennedy, J.) (*Miranda* warning not defective simply because defendants not specifically advised that statements given under grant of state immunity could not be used in federal prosecution), *cert. denied,* 474 U.S. 832, 106 S.Ct. 100, 88 L.Ed.2d 81 (1985); *United States v. Ruth,* 394 F.2d 134, 136 (3d Cir.) (defendant unsuccessfully argued his waiver not effective because he allegedly did not know an oral, as opposed to written, statement would be admissible against him), *cert. denied,* 393 U.S. 888, 89 S.Ct. 206, 21 L.Ed.2d 166 (1968).

less to say, there is no law that requires this Court to give constitutional protection to the defendant's contingency plans for an escape to South America. Therefore, for the reasons set forth below, the Court will deny the defendant's motion to suppress.

## FACTUAL BACKGROUND

On March 2, 1990, Special Agent Brandt A. Schenken, of the U.S. Treasury Department's Bureau of Alcohol, Tobacco & Firearms ("ATF"), began a federal firearms investigation at Bill's Gun Shop in Dover, Delaware. (*See* Docket Item ["D.I."] 10 at 3–4 [transcript of suppression hearing].) Through this investigation, Agent Schenken learned that the defendant, Walter A. Durham, had placed a down payment on an SKS 7.62 × 39 Chinese assault rifle. (*Id.*) Agent Schenken also learned that the defendant had seven prior criminal convictions. (*See id.* at 4–5.) On March 29, 1990, a warrant was obtained for the defendant's arrest. (*See* D.I. 1.)

The defendant was contacted and agreed to surrender to ATF agents at Troop 3 of the Delaware State Police in Camden, Delaware. (D.I. 10 at 3.) He arrived at the lobby of Troop 3, as promised, on April 4, 1990, at approximately 2:30 p.m. (*see id.* at 3, 5), and surrendered himself to Agent Schenken and another ATF Agent named Larry Duchnowski. (*Id.* at 5–6.) Also present in the lobby at this time were two other ATF agents, as well as a woman named Rashenda Melvin and a boy accompanying her, both of whom had entered the lobby with the defendant. (*Id.* at 5.)

The defendant was frisked and handcuffed. According to Agent Schenken, the defendant's demeanor at this point was "calm, but yet he seemed nervous, like he was doing something he wasn't used to doing." (*Id.* at 6.) Agent Schenken later elaborated that "[b]eing arrested and turning yourself in ... are two different

things." (*Id.* at 36.) The defendant, Agent Schenken explained, "appeared like he was doing something that he wouldn't be used to doing, which would be turning himself in." (*Id.*)

After frisking and handcuffing him, Agent Schenken showed the defendant a copy of the warrant and told him he was under arrest for "federal firearms charges, possession of a firearm by a person prohibited." (*Id.* at 23.) The defendant was thereafter taken to a cell block, where he was strip searched by one of the other ATF agents, Agent Pat Clowry. (*Id.* at 6.) Agent Schenken was present during this search, which lasted approximately ten minutes. (*Id.*)

The defendant then dressed, and was taken to be photographed. Agent Schenken and Agent Clowry subsequently took the defendant to a processing room, where he was placed in a belly chain. (*Id.* at 7.) In the processing room, Agent Schenken told the defendant he had to read him his *Miranda* rights. (*Id.*) The defendant replied that "he knew them." (*Id.*) Agent Schenken told the defendant he still had "to read them anyway," which he then did.[2] (*Id.*) At this point, Agent Mark R. Swartswelder, the fourth ATF agent at Troop 3, was also present in the processing room, and it was approximately 2:55 p.m. (*See id.* at 7–8.)

The defendant said nothing in response to the advisement of his rights. (*Id.* at 7.) Agent Schenken then placed a standard ATF waiver of rights form in front of the defendant and asked him to read it, which the defendant appeared to do.[3] (*See id.*) The defendant signed the portion of the form that indicated that he had been advised of his rights and that he understood those rights. (*See id.* at 7–8; *see also* Government Exhibit 1.) Agent Schenken thereafter read the section of the form that consists of a waiver of the suspect's *Mi-*

---

**2.** The defendant does not deny that he was read his rights. (*See* D.I. 12 at 2.)

**3.** The waiver of rights form given to the defendant contains, at the top, an accurate statement of the rights specified in *Miranda* and, further down, a statement of waiver of those rights.

(*See* Government Exhibit 1, 5–14–90 Suppression Hearing.) At the bottom of the form is a section in which an ATF agent can certify that he read the suspect his rights and that the suspect signed the form in the agent's presence. (*See id.*)

*randa* rights, and passed the form back to the defendant to read. (D.I. 10 at 27–28.) Agent Schenken testified that he asked the defendant if he wanted to sign the waiver. (*Id.* at 28.) The defendant did not sign the waiver. (*Id.* at 9.) According to Agent Schenken, the defendant "stated that he would tell us anything that we wanted to know, but he wouldn't sign anything." (*Id.*) This response was written down on the signature line beneath the waiver portion of the form, and Agents Schenken and Swartswelder signed the bottom of the waiver form to certify that the defendant had been read his rights and signed the acknowledgement in their presence. (*See* Government Exhibit 1.)

At approximately 3:00 p.m., less than five minutes after reviewing the defendant's *Miranda* rights, Agents Schenken and Clowry and the defendant got into a Chevy Blazer automobile to drive to Wilmington for the defendant's initial appearance. (D.I. 10 at 10–11.) Agent Clowry was in the driver's seat; Agent Schenken was in the front passenger seat; and the defendant was seated directly behind Agent Schenken, in the rear passenger seat. (*Id.* at 11.) The defendant was still restrained by the belly chain and handcuffs which had been placed on him while at Troop 3. (*See id.*)

After about five minutes in the vehicle, Agent Schenken asked the defendant "to tell [him] about what had happened...." (*Id.* at 12.) According to Agent Schenken, a 15 to 20 minute conversation followed during which the defendant confessed to the crimes for which he was arrested. (*Cf. id.* at 12, 15–17.) The defendant then went on to comment that he had escaped from custody three times, and that "if he thought the charges were serious, he would have gone to Peru and it would have taken a whole crew of you guys to catch me." (*Id.* at 32–33; *see also* Government Exhibit 2 at 2.)

On April 24, 1990, the defendant was charged in a two-count indictment with possession of a firearm by a person prohibited (Count I), in violation of 18 U.S.C. § 922(g)(1) (West Supp.1990), and conspir-

acy in the making of a false statement in connection with the acquisition of a firearm (Count II), in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(1)(B) (West Supp.1990). (*See* D.I. 2.) The defendant entered a not guilty plea to both counts on May 3, 1990, and thereafter, on May 4, 1990, moved to suppress the statements made by him on the day of his arrest. (*See* D.I. 5.) The Court held a suppression hearing on May 14, 1990 (*see* D.I. 7; D.I. 10 [transcript]), and both sides subsequently submitted letter memoranda in support of their respective positions. (*See* D.I. 12; D.I. 13; D.I. 14.)

At the suppression hearing, the government presented the testimony of Agent Schenken, along with two exhibits. Government Exhibit 1 is the ATF waiver of rights form discussed above, and Exhibit 2 is Agent Schenken's typewritten report of his interview with the defendant. No other evidence was presented.

## DISCUSSION

The defendant seeks to suppress his statements because he contends that he did not waive his *Miranda* rights and his statements were not given voluntarily. The defendant particularly underscores the fact that "it was apparent to the ATF agents that [he] was unaware of the serious nature of the charges against him." (D.I. 14 at 2.)

### I. *Validity of the Miranda Waiver*

█ As most recently characterized by the Supreme Court, *Miranda v. Arizona* stands for the proposition "that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins,* —— U.S. ——, ——, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990); *see also Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). *Miranda* is based on the premise that a "danger of coercion results from the interaction of custody and official interrogation." *Perkins,* —— U.S. at ——, 110 S.Ct. at 2397; *see also Miranda,* 384 U.S.

at 458, 86 S.Ct. at 1619. Thus, a person who is taken into custody must be warned of his rights prior to any questioning, and must be permitted to exercise these rights at any point throughout the interrogation. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630.

■ A suspect can, of course, waive his *Miranda* rights; but such a waiver must be made voluntarily, knowingly, and intelligently. *See, e.g., Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). The validity of a suspect's waiver of his *Miranda* rights is assessed in light of the "totality of the circumstances surrounding the interrogation." *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979); *see also United States v. Velasquez,* 885 F.2d 1076, 1086 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). In analyzing the totality of the circumstances, a court "must look at the facts of the particular case, including the background, experience, and conduct of the suspect." *Velasquez,* 885 F.2d at 1086 (citation omitted). The government bears the burden of proving the validity of the waiver by a preponderance of the evidence. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

■ Two factors must be considered to determine whether the waiver was voluntary, knowing, and intelligent:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and *the consequences of the decision* to abandon it.

*Moran,* 475 U.S. at 421, 106 S.Ct. at 1141 (emphasis added). By "consequences of the decision" to abandon his *Miranda* rights, the Supreme Court did not mean

that the police were required to advise a suspect of all information that might be relevant to a decision to waive his rights. *See id.* at 422, 106 S.Ct. at 1141; *see also Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."). Rather, the pertinent consequences, regarding which a suspect must be informed, are that the state will use any information given by him to help secure his conviction. *See Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625; *cf. Riddick v. Edmiston,* 894 F.2d 586, 591 (3d Cir.1990) (discussing *Patterson v. Illinois,* 487 U.S. 285, 293–94, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988)).

■ The defendant here argues that the ATF agents realized that he was not aware of his exposure to enhanced punishment as a habitual offender under 18 U.S.C. § 924(e).[4] The fact that the defendant was unaware of this possibility of enhanced punishment allegedly means that he was unaware of the consequences of a waiver of his *Miranda* rights and that, therefore, the ATF agents were obligated to correct the defendant's misperception. The Court rejects this argument.

■ The defendant's constitutional right is to "not be *compelled* to give self-incriminating testimony." *U.S. v. Washington,* 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). The Constitution does not, however, require "the police [to] supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran,* 475 U.S. at 422, 106 S.Ct. at 1141. Nor is such a result even desirable. The Supreme Court has observed that "[p]olice officers are ill-equipped to pinch-hit for counsel, construing the murky and difficult questions of when 'custody' begins or whether a given unwarned statement will ultimately be held admissible."

---

4. Under this provision, a person who is convicted of the crime of possession of a firearm by a person prohibited, *see* 18 U.S.C. § 922(g), is to be "imprisoned not less than fifteen years" if such person has three prior convictions "for a violent felony or serious drug offense...." 18 U.S.C. § 924(e)(1) (West Supp.1990).

*Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985). ATF agents would seem similarly ill-equipped to render legal opinions as to statutory sentencing procedures.

In this case, as in *Colorado v. Spring,* "the additional information could affect only the *wisdom* of a *Miranda* waiver, *not* its essentially voluntary and knowing nature." 479 U.S. at 577, 107 S.Ct. at 859 (emphasis added). Thus, Agent Schenken's failure to comment [5] on the defendant's possible sentence does not invalidate the waiver. Nor do any other facts in this case suggest that the defendant's waiver was less than valid.

During his interrogation in the vehicle, the defendant never asked for an attorney or attempted to stop the discussion. (D.I. 10 at 17–18.) Agent Schenken testified that he did not threaten the defendant or make him any promises. (*See id.* at 12.) The defendant did not request to use the bathroom during the car ride, nor did he claim he was hungry or thirsty. (*Id.*) Agent Schenken spoke in a normal tone of voice (*see id.* at 12), and the defendant's comments and responses during the conversation were knowledgeable, responsive, and calm. (*See id.* at 19.) Agent Schenken also testified that the defendant "appeared to be more relaxed" during the car ride than he had been inside Troop 3. (*See id.* at 13.)

■ The fact that the defendant refused to sign a written waiver does not negate his intent to waive his *Miranda* rights through his oral statement and conduct. It is well settled that a waiver may be made orally or may be implied from a suspect's conduct. *See North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). In this case, when there were quiet intervals during the ride to Wilmington, it was the *defendant* who would often initiate conversation with the ATF agents. (D.I. 10 at 18.) Even more importantly, the defendant accompanied his refusal to give a written waiver with an offer to "tell [the ATF agents] anything [they] wanted to know ..." [6] (D.I. 10 at 9.)

---

**5.** The Supreme Court has found, in certain circumstances, that "affirmative misrepresentations by the police [are] sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege." *Spring,* 479 U.S. at 576 n. 8, 107 S.Ct. at 858 n. 8 (citations omitted). Similarly, the Third Circuit has noted that "a lie told to the detainee about an important aspect of the case may affect the voluntariness of the confession...." *Miller v. Fenton,* 796 F.2d 598, 607 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986), *quoted in Velasquez,* 885 F.2d at 1088. The facts in this case, however, do not reveal any misconduct. Indeed, no such impropriety is even alleged. (*See* D.I. 12; D.I. 14.)

The defendant does not complain that he was given any false information. Rather, his complaint is that he was not given a certain kind of information at all. In particular, the defendant contends that the ATF agents should have given him sentencing information—which, the Court notes, he did not request and which is not required by *Miranda.* Because of these facts, the Court need not and does not express any opinion as to the validity of a *Miranda* waiver or the voluntariness of a confession where law enforcement agents conducting an interrogation make representations, later found to be false, regarding the level of punishment the suspect can expect if convicted of the crime with which he is, or is to be, charged.

The Court further notes that, in this case, the ATF agents did not even know of the defen-

dant's "misapprehension" before he made his confession. Agent Schenken testified that the defendant spoke about possessing the assault rifle in question *prior* to making his comments about escaping to Peru had the charges been serious. (*See* D.I. 10 at 32; *see also supra* p. 501.) Thus, even if mere silence could be construed as some form of trickery or inducement, a characterization with which this Court would not agree, it is still clear that there was no such attempt to deceive here because the defendant had already confessed when he first brought up the severity (or presumed lack thereof) of the charges against him.

**6.** In *Connecticut v. Barrett,* 479 U.S. 523, 525, 107 S.Ct. 828, 830, 93 L.Ed.2d 920 (1987), the defendant signed a card acknowledging that he had been read his *Miranda* rights, and stated that he understood those rights. The *Barrett* defendant refused to give the police officers interrogating him a written statement without the presence of his attorney; however, he told the officers he "had 'no problem' *talking* about the incident." *Id.* (citation omitted) (emphasis added). The defendant then went on to make an oral statement, admitting his involvement in the crime he was suspected to have committed. *Id.* The state supreme court ruled that the statement was inadmissible. The U.S. Supreme Court reversed.

Among the Court's comments were the following observations which are relevant to this case:

**504**

The defendant himself underscored at the time of his arrest that he was already familiar with his *Miranda* rights. *See supra* p. 500. He also does not deny that he was read his rights at the time of the arrest in this case. *See supra* note 2. Moreover, he was given a written statement of his rights, which he appeared to read [7] and which he signed in acknowledgement. (*See* D.I. 10 at 9–10.) That the defendant knew he could stand by those rights is clear from his decision to sign only the acknowledgement and not the waiver. That he nonetheless chose to make an oral statement does not undermine the validity of the waiver; it only reflects upon his judgment. In light of all these circumstances, the Court finds that the government has shown by a preponderance of the evidence that the defendant's *Miranda* waiver was knowing, voluntary, and intelligent.

## II. *Voluntariness of the Statements* [8]

■ The voluntariness inquiry focuses on "whether the defendant's will was overborne when he confessed." *Miller*, 796 F.2d at 604 (citations omitted). In conducting this inquiry, a court should consider various factors, including the defendant's background, whether he was informed of his rights, the length and nature of the interrogation and accompanying detention, and any deprivation of food or sleep. *Id.*

> We ... reject the contention that the distinction drawn by [the defendant] between oral and written statements indicates an understanding of the consequences so incomplete that we should deem his limited invocation of the right to counsel effective for all purposes ... The fact that some might find [the defendant's] decision illogical is irrelevant. ... *Id.* at 530, 107 S.Ct. at 832–33 (footnote omitted). The Court went on to note that the distinction drawn by the defendant, between oral and written statements and his willingness to offer only the former, was not "in fact illogical, for there may be several strategic reasons why a defendant willing to speak to the police would still refuse to write out his answers to questions, or to sign a transcript of his answers prepared by the police, a statement that may be used against him." *Id.* at 530 n. 4, 107 S.Ct. at 530 n. 4.

■ The interrogator's psychological "ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id.* Accordingly, the Court must determine whether the statements or tactics of the interrogator "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *Id.* The government must prove the voluntariness of these statements, like the validity of a waiver of *Miranda* rights, by a preponderance of the evidence. *See Connelly*, 479 U.S. at 169, 107 S.Ct. at 523.

■ The Court has reviewed all of the facts in this case. There is simply no basis for concluding that the defendant's statements were coerced or resulted from overly manipulative tactics. First, there is little about the atmosphere surrounding this interrogation that would suggest intimidation or coercion. The interrogation began just a few minutes after the defendant was advised of his rights. (D.I. 10 at 30.) It lasted no more than twenty-five minutes (*see id.* at 29) and took place during the day, in a Chevy Blazer which had windows on all sides. (*Id.* at 12.) Agent Schenken described the interrogation as follows:

> Q. Would you describe what the tempo of the conversation was, meaning, was it a monologue or dialogue?

7. There is no indication that the defendant did not understand the English language. (*See* D.I. 10 at 9.)

8. The defendant did not actually specify whether he is contending that his *Miranda* waiver was not voluntary, or that his statements themselves were not voluntary, or both. (*See* D.I. 12.) As our Court of Appeals has noted, these are "related but distinct issue[s]...." *Velasquez*, 885 F.2d at 1084 n. 6.

Because of this ambiguity, the Court will consider both arguments. The Court notes, however, that because the analytical approach is the same, namely an examination of the "totality of the circumstances," and the burden on the government is the same, namely a "preponderance of the evidence," much of the discussion of the voluntariness of the defendant's statement will overlap with the Court's previous discussion of the voluntariness of the waiver of his *Miranda* rights. *Cf. id.* at 1088.

A. I would ask him a question, and I would allow him to elaborate on it as much as he wished to. And occasionally, I would add a brief question or something, just to get him to continue speaking.

Q. Were there any times when the conversation lagged?

A. Yes.

Q. How did the conversation resume after those lags?

A. A lot of the times, Walter [*i.e.*, the defendant] would just start speaking about things. He appeared to not like silence, in the conversation, that is.

(*Id.* at 18.)

As noted previously, the defendant did not make any complaints about being hungry, thirsty, or in need of a bathroom. *See supra* p. 503. He received no threats or promises (*see id.*; *see also* D.I. 10 at 12), and he did not complain about the handcuffs and chains that restrained him while he was seated in the rear passenger seat of the vehicle. (D.I. 10 at 11.) Agent Schenken further testified that the defendant did not appear to be tired,[9] intoxicated, or under the influence of drugs. (*Id.* at 9.) Although he was somewhat nervous when he first arrived at Troop 3, accompanied by a woman and a child (*see id.* at 33), the defendant was more relaxed later during the interrogation in the Chevy Blazer. (*Id.* at 13.)

Another important factor is the defendant's familiarity with the criminal system. *See Miller*, 796 F.2d at 606. The defendant was not " 'soft, ignorant or timid.' " *Id.* at 606 n. 8 (citation omitted). He was " 'not inexperienced in the ways of crime or its detection, nor ... dumb as to [his] rights.' " *Id.* (citation omitted). Four of his seven previous convictions were for "violent felonies," as that term is used in 18 U.S.C. § 924(e)(2)(B). (*See* D.I. 4.)

Finally, the ten-minute strip search at Troop 3 was certainly not sufficient to transform the defendant's voluntary statements into a coerced confession. Although it was undoubtedly not a pleasant experience, the strip search was reasonable under the circumstances. Agent Schenken testified that one of the defendant's prior convictions was for "escape—second." (*See* D.I. 10 at 34–35; *see also* D.I. 4.) Therefore, the ATF agents thought it would be wise to strip search the defendant prior to the trip with him from Camden to Wilmington, where he was to be placed in the U.S. Marshal's custody. Given that the defendant has *seven* prior convictions and, consequently, has been through the "booking" process at least that many times, the Court finds it unlikely that a short and routine strip search would be sufficient to overcome the defendant's will.

Having considered all of the circumstances of the interrogation, the Court concludes that the government has met its burden of showing by a preponderance of the evidence that the defendant's statements were voluntarily given. The defendant was not a victim of manipulation; nor was he under some overwhelming, police-fabricated "illusion that [the interrogation] was nonadversarial in character...." *Miller*, 796 F.2d at 607. The defendant simply confessed because he thought a federal firearms charge was not "serious." The Constitution protects the defendant against government coercion and, at least arguably, deception.[10] But it does not shield him from his own improvidence.

## CONCLUSION

The Court finds that the defendant's waiver of his *Miranda* rights was valid. Further, the statements made by him on the day of his arrest were voluntary. Accordingly, the defendant's motion to suppress these statements will be denied.

---

**9.** The Court notes that the interrogation began only half an hour after the defendant was placed under arrest and, as already noted, lasted no more than approximately twenty-five minutes.

**10.** *But cf. Perkins*, —— U.S. at ——, 110 S.Ct. at 2397 ("Ploys to mislead a suspect ... that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns.").