**UNITED STATES of America,
Plaintiff,**

v.

**Michael CHAMBERS, Defendant.**

**No. CR.A. 01–91–JJF.**

United States District Court,
D. Delaware.

Oct. 23, 2002.

---

Edmond Falgowski, Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, DE, for Plaintiff.

Penny Marshall, Assistant Federal Public Defender, Wilmington, DE, for Defendants.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is Defendant Michael Chambers' (hereinafter "Defendant") Motion to Suppress Evidence and Statements (D.I.14). For the reasons set forth below, the motion will be granted in part and denied in part.

### I. Nature and Stage of the Proceedings

Defendant has been charged by indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), with knowing possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k)(1) and 924(a)(1)(B), and with possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Defendant moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fourth Amendment of the United States Constitution to suppress any and all tangible evidence seized at the time of his arrest on October 25, 2001. Defendant further moves pursuant to the Fifth Amendment of the United States Constitution to suppress any and all statements taken from him on or about the time of his arrest.

The Court held a hearing on the Motion (D.I.14) on June 4, 2002, and ordered the parties to submit proposed findings of fact and conclusions of law. (D.I. 24; D.I. 25). This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law regarding the instant Motion (D.I.14).

## II. Legal Standard on a Motion to Suppress

Rule 41(f) of the Federal Rules of Criminal Procedure provides that "[a] motion to suppress evidence may be made in the court of the district of trial as provided in Rule 12." Fed.R.Crim.P. 41(f). Rule 12 provides that suppression motions should be made prior to trial. *See* Fed.R.Crim.P. 12(b)(3), (f).

Ordinarily, a defendant who files a motion to suppress carries the burden of proof. *See United States v. Lewis,* 40 F.3d 1325, 1333 (1st Cir.1994). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement. *See United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir.1992).

## III. Findings of Fact

### A. Introduction

In presenting their respective proposed findings of fact the Defendant and Government have recounted the events of October 25, 2001 from different perspectives. As Defendant noted in his opening paper:

Interpretation of the facts provides the true motive of the search of 2603 Bowers Street on October 25, 2001, and the reason for the lengthy interrogation that followed. This was not simply an execution of a capias, but rather the encounter became a murder investigation conducted in concert with probation officers because of the absence of probable cause.

(D.I. 24 at 1).

The Government responds to the Defendant's contention head-on:

In making its claim, Chambers baselessly criticizes and attributes bad motives to PO McLaughlin. No less than nine officers were sent to execute the capias because Chambers appropriately was considered that dangerous. He has six felony convictions for robbery, assault, possession of a deadly weapon by a person prohibited, assault in a detention facility and two escapes after conviction. PO McLaughlin's perception that Chambers was a particularly dangerous fugitive was confirmed by Chambers' post-arrest admission that he delayed in coming down the stairs because he had considered shooting it out with the probation officers .... Accordingly, there is no basis for Chambers' allegation that PO McLaughlin conducted a probationary search as a subterfuge to furthering a homicide investigation.

(D.I. 28 at 1 n. 2).

The findings of fact made by the Court have not been influenced by either party's perspective. The Court understands that the Defendant is a potentially dangerous and potentially violent repeat offender. The Court also understands that the police and probation officers who were looking for the Defendant on October 25, 2001, pursuant to the capias issued by the Superior Court were also interested in Defendant's possible involvement in other serious crimes. The Court's consideration of the evidence offered at the hearing is limited to the conduct of the participants in the 2600 block of Bowers Street in the early morning hours of October 25, 2001, when the law enforcement officers on the scene sought to execute a capias for the arrest of the Defendant as an accused probation violator.

### B. The Search of 2603 North Bowers Street

1. On the morning of October 25, 2001, nine probation and Wilmington Police Department officers, including PO McLaughlin, proceeded to the 2600 block of North

Bowers Street looking for Defendant. (Tr. at 12, 14, 152).

2. The officers were acting on the information of two confidential informants, of which one had notified PO McLaughlin that Chambers was allegedly involved in the sale of narcotics and was placing telephone calls from a certain number. This number was subsequently traced to 2605 North Bowers Street (hereinafter "2605"). (Tr. at 36–38).

3. The officers first went to a two story row house located at 2603 North Bowers Street (hereinafter "2603"). Failing to obtain a response from inside, several of the officers proceeded to nearby 2605. Upon speaking with the residents there, PO McLaughlin learned that Defendant was in fact located in 2603. (Tr. at 12, 34).

4. At approximately 6:25 am, the officers again approached 2603 and knocked on the door. After approximately ten minutes, the lessee of the residence, Tanesha Wright (hereinafter "Ms. Wright"), answered the door. While inquiring as to Defendant's whereabouts, PO McLaughlin heard noises inside the house and noticed a light turned on upstairs. (Tr. at 13–15).

5. PO McLaughlin next informed Ms. Wright that the officers believed Defendant was located inside. In response, Ms. Wright tilted her head toward the stairs. PO McLaughlin then advised Ms. Wright that the officers were entering to check the residence. (Tr. at 17–18).

6. Shortly thereafter, Defendant appeared from an upstairs bedroom on the right side of the house (hereinafter "the right bedroom"), and identified himself as James or Kevin Wright.[1] Not recognizing him, PO McLaughlin had Defendant detained while he and several other officers proceeded upstairs. (Tr. at 19–20, 155, 172).

7. Once upstairs, PO McLaughlin entered the right bedroom and found a mattress in the corner supported only by a box spring. PO McLaughlin proceeded to lift up the mattress and boxspring as a unit, placing his hand on the base of the boxspring. After lifting the mattress and boxspring about a foot into the air, he then placed the mattress and boxspring back onto the floor, and responded to a call from another officer in an adjacent bedroom. (Tr. at 21, 23–26, 81).

8. Shortly thereafter, PO McLaughlin returned to the right bedroom and again inspected the box spring and mattress. After again lifting the bed in its entirety, PO McLaughlin searched the space between the mattress and box spring. Upon separating the two sections of the bed, PO McLaughlin observed a rifle and a handgun on top of the box spring. (Tr. at 24–25, 80–82).

9. As the right bedroom was the last section of the house to be checked, PO McLaughlin and the other officers proceeded downstairs, leaving the recently discovered firearms untouched. Once downstairs, PO McLaughlin again observed the detained individual, and identified him as Michael Chambers. (Tr. at 29–31).

10. Sometime later that same day, Detective Scott Chaffin of the Wilmington Police Department obtained and executed a search warrant for the 2603 residence, recovering from the right bedroom a Colt AR–15 assault rifle and a Ruger 9mm semi-automatic handgun. In addition, after a further search, three hundred and ninety nine separately wrapped glassine

1. There is uncertainty in the record as to which name Defendant initially gave to PO McLaughlin.

bags of heroin were seized from another bedroom. Shortly thereafter, charges relating to the seized guns and heroin were filed against Defendant. (Tr. at 123–127).

## B. Defendant's Subsequent Statements

11. After being transported to the Wilmington Police Department, Defendant was interviewed by Detective Brian Waynant (hereinafter "Det. Waynant") at approximately 12:00 p.m. Det. Waynant sought information from Defendant regarding an unrelated homicide investigation. Defendant was at no point prior to or during this interview provided *Miranda* warnings. (Tr. at 96, 197–198).

12. During this interview, Defendant raised the subject of the guns and heroin seized at 2603, and inquired as to the term of incarceration the charges related to the guns and heroin might bring. Det. Waynant responded that it would depend upon his cooperation. In turn, Defendant stated that he had information related to where he purchased the confiscated guns. (Tr. at 112–113).

13. In addition, Det. Waynant raised the issue of whether Defendant had retained counsel:

A. I asked him ["]who do you normally use as a lawyer["], and he told me Joe Benson....

Q. Did the Defendant ever say ["]I want Joe Benson on this case["]?

A. No.

Q. Did he ever say Joe Benson is representing you on this case?

A. No.

(Tr. at 112–113).

14. Following this initial interview, Wilmington Police Department Drug Unit Detectives Charles V. Emory, Jr. (hereinafter "Det. Emory") and Richard Armorer (hereinafter "Det. Armorer") spoke with Defendant in reference to gathering intelligence for unrelated investigations. In ad-dition, the Defendant discussed with the detectives the contraband seized earlier that morning. The detectives did not provide Defendant with *Miranda* warnings prior to or during this interview. (Tr. at 116–118).

15. After Det. Emory and Det. Armorer concluded, Det. Waynant returned to interview Defendant again, this time videotaping the session. During this second interview, Det. Waynant read Defendant his *Miranda* rights. (Tr. at 101–104).

16. Defendant then verbally waived his rights, and thereafter confessed to knowingly possessing the guns and heroin at issue in the instant motion. (Government's Exhibit 1).

## IV. Conclusions of Law

### A. Legality of the Search

■ 1. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV.

■ 2. The United States Supreme Court has held that the Fourth Amendment permits a "limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A protective sweep may be conducted as a "precautionary matter and without probable cause or reasonable suspicion," and entails "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. 1093. Such a warrantless search is justified because the interest of the arresting officers

in taking reasonable steps to ensure their safety while making an arrest outweighs the intrusion such procedures may entail. *Id.*

3. In analyzing the search of the mattress and box spring in the right bedroom, the Court must determine whether the officers were properly conducting a protective sweep of the premises. Based on the findings of fact made in this Memorandum Opinion, the Court concludes that PO McLaughlin's search of the mattress and box spring in the right bedroom a second time exceeded the scope of a lawful protective sweep.

4. Upon lifting the bed approximately one foot the first time, PO McLaughlin had taken the requisite precautions to ensure his safety and had effectively neutralized the bed as a place "from which an attack could be immediately launched." With the possibility that a person was hiding in or under the bed eliminated, PO McLaughlin's authority to search under *Buie* had ceased.

5. Because he had already inspected it once, the Court concludes that PO McLaughlin's subsequent search of the bed exceeded the scope of a permissible protective sweep, and therefore violated Defendant's Fourth Amendment rights. Accordingly, the guns found between the mattress and box spring will be suppressed.

### B. The Heroin

1. The United States Supreme Court has held that evidence must be excluded when it "would not have come to light but for the illegal actions of the police," and where such evidence "has been come at by exploitation of that illegality." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

2. Because the probable cause for the search warrant stemmed solely from the illegally discovered guns, the Court con-cludes that the heroin would not have been located "but for" the "exploitation" of PO McLaughlin's actions. Accordingly, the heroin found pursuant to the search warrant for 2603 will also be suppressed.

### C. Statements Made By Defendant

█ 1. The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself ...." U.S. Const. amend. V.

2. The Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 444, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), stated "[o]ur holding ... briefly stated ... is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, the defendant indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone

and indicates in any manner that he does not wish to be interrogated, the police may not question him."

3. The Court has held in the past that it is the Government's burden, in accord with *Miranda* and its progeny, to prove that waiver of privilege was both: (a) voluntary; and (b) knowing and intelligent. First, the statements must be given voluntarily in the sense that it was the product of a free and deliberate choice rather than the result of intimidation, coercion or deception. Second, the waiver must be knowing and intelligent in the sense that it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See United States v. Durham,* 741 F.Supp. 498, 502 (D.Del.1990).

4. The Court concludes that the Government has met its burden of proving that Defendant's waiver was voluntary, knowing, and intelligent. Although Det. Waynant discussed the guns and heroin with Defendant during his initial interview, the subject was raised briefly by Defendant, and in a context which was not pursued thereafter by Det. Waynant. *(See e.g.* Tr. at 109). Furthermore, no record was ever made by Det. Waynant as to what was discussed. *(See e.g.,* Tr. at 110). Because Defendant made his incriminating statements only after Det. Waynant returned to the interview room, turned on the video camera, and read Defendant his rights, the Court concludes that the Government has adequately demonstrated "the use of procedural safeguards effective to secure the privilege against self-incrimination." Therefore, the Court will admit the statements made by Defendant at or about the time of his arrest.

### V. Conclusion

For the reasons discussed, Defendant's Motion to Suppress Evidence and Statements (D.I.14) will be granted as it pertains to the tangible evidence (guns and heroin) and will be denied as it pertains to any statements made by Defendant.

An appropriate Order will be entered.