**UNITED STATES, Appellee,**

v.

**Otis Darren LEWIS, Defendant–Appellant.**

**UNITED STATES, Appellee,**

v.

**Michael STARKS, Defendant–Appellant.**

**Nos. 93–1819, 93–1820.**

United States Court of Appeals, First Circuit.

Heard June 8, 1994.

Decided Nov. 14, 1994.

comparison. We leave this determination to the discretion of the district court.

William A. Brown by Appointment of the Court, Boston, MA, for appellant Otis Darren Lewis.

James P. Duggan by Appointment of the Court, Boston, MA, for appellant Michael Starks.

Thomas C. Frongillo, Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., and Michael J. Pelgro, Asst. U.S. Atty., Boston, MA, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Circuit Judge.

A federal grand jury returned a five-count indictment charging Otis Darren Lewis and Michael Starks with (1) being felons-in-possession of firearms, (2) carrying and using firearms during and in relation to a drug trafficking crime, and (3) possession with intent to distribute cocaine base. Following a four day trial, a jury found Lewis and Starks guilty on all counts. The court then sentenced Lewis to serve 322 months in prison. The court sentenced Starks to serve 144 months in prison. Lewis and Starks now appeal their convictions and sentences on various grounds. For the following reasons, we affirm.

## BACKGROUND

### A. Facts

On Friday, August 14, 1992, a confidential informant telephoned Officer Robert Leedberg of the Brockton Police Department "Gang Unit" on a cellular phone. The informant stated that two men, Otis Darren Lewis ("Lewis") and Michael Starks ("Starks"), were in possession of firearms inside Pete & Mary's Bar, located on the corner of Montello and Franklin Streets in downtown Brockton. Because Officer Leedberg was involved in another case on August 14, 1992, he did not respond to the tip.

The confidential informant again telephoned Officer Leedberg on August 15, 1992, at about 11:00 p.m. and then again at 12:20 a.m. on August 16, 1992. The confidential

informant told Officer Leedberg that Lewis and Starks were again in possession of firearms in Pete & Mary's Bar. He stated that he had seen the firearms and the informant then described to Officer Leedberg how Lewis and Starks were dressed. After obtaining this information, Officer Leedberg and Brockton Police Officers James Smith and Thomas Keating established surveillance in the vicinity of Pete & Mary's Bar. The officers were in an unmarked police cruiser and were dressed in street clothes.

During the course of their investigation, Officer Smith left the unmarked police car to conduct surveillance from Montello Auto Sales, a used car lot located directly across the street from the front of Pete & Mary's Bar. Officers Leedberg and Keating remained in the unmarked police cruiser and drove to a surveillance post in a parking lot behind Pete & Mary's Bar. They watched the rear door of the bar from this location.

At about 12:35 a.m., the confidential informant arrived in the parking lot behind the bar. Officers Leedberg and Keating met with the informant and observed him enter and later leave the bar. After leaving the bar, the informant conferred with Officer Smith in the used car lot. Officer Smith then called Officers Leedberg and Keating on the radio. After receiving this call, Officers Leedberg and Keating moved their unmarked police cruiser to a position from which they could observe the front of the bar. At about 1:00 a.m., Officer Smith saw Lewis and Starks leave Pete and Mary's Bar, cross Montello Street, and approach a brown Buick parked at the D'Angelo's Sub Shop ("D'Angelo's") parking lot.

As Lewis and Starks stood near the brown Buick, Officers Leedberg and Keating were rapidly approaching the D'Angelo's parking lot in their unmarked police car. Starks recognized the unmarked police car as a result of a previous encounter with Officers Leedberg and Smith.

As Officers Leedberg and Keating advanced, Officer Smith, who was still conducting surveillance from the used car lot adjacent to the D'Angelo's parking lot, observed Starks bend down, place a black object under the Buick, and straighten up. Officer Smith then saw Lewis similarly bend down on the driver's side of the Buick. Officer Leedberg then parked the unmarked police vehicle behind the brown Buick. As Officer Keating exited the car, he saw Starks waiving his hands and approaching the police car. Officer Keating then observed Lewis stand up on the driver's side of the Buick. After exiting the unmarked police car, Officer Leedberg repeatedly shouted, "Police, don't move; keep your hands in sight." Officer Smith then pat-frisked Lewis. Officer Leedberg pat-frisked Starks. Neither officers found any guns or narcotics at this time. On instructions from Officer Smith, Officer Keating then searched the parking lot where the pair had just bent down and stood up. He found a loaded 9 millimeter Beretta pistol and a vial containing 17 pieces of a substance later determined to be "crack cocaine" under the brown Buick. He also found a loaded .45 caliber Star pistol and a vial containing 22 pieces of crack cocaine under a car parked alongside the brown Buick. The police officers then placed Lewis and Starks under arrest.

## B. Procedural History

A federal grand jury returned a five-count indictment charging Lewis and Starks with (1) being felons-in-possession of firearms in violation of 18 U.S.C. § 922(g)(1), (2) carrying and using firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); and (3) possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). Following the indictment, Lewis and Starks filed a motion to suppress the guns and narcotics which the police had seized on the morning of the arrest as being the fruit of an unlawful search and seizure. The district court denied this motion and admitted the evidence. 816 F.Supp. 789. Following a four day trial, a jury found Lewis and Starks guilty on all counts. The court calculated that, under the sentencing guidelines, the crimes committed by Lewis and Starks amounted to a total offense level of 26. The court determined that Lewis' prior crimes placed him in criminal history category IV and sentenced him to serve 322 months in prison. The court

placed Starks in criminal history category III and sentenced him to serve 144 months in prison. Lewis and Starks now appeal various issues connected to their convictions and sentences.

## DISCUSSION

### I. The evidentiary hearing

■ Lewis and Starks filed a motion to suppress, contending that the police officers improperly seized the firearms and cocaine. With respect to the motion, Lewis and Starks contend that the district court erred by failing to order an evidentiary hearing. As a preliminary matter, we note that the district court is entrusted with deciding whether to hold an evidentiary hearing and we will not overrule the refusal to convene an evidentiary hearing unless the district court is shown to have abused its discretion. *United States v. McAndrews*, 12 F.3d 273, 280 (1st Cir. 1993). Lewis and Starks have made no such showing.

■ "[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir.1990) (citations omitted). Evidentiary hearings on motions to suppress are required only when a defendant makes a sufficient showing that a warrantless search has occurred. *United States v. Migely*, 596 F.2d 511, 513 (1st Cir.), *cert. denied*, 442 U.S. 943, 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979). To make this showing "[t]he defendant must allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" *Id.* (quoting *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir.), *cert. denied*, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967). The defendant must allege facts that, if proven, would entitle him to relief. *Migely*, 596 F.2d at 513.

■ Lewis and Starks have not shown that they were entitled to an evidentiary hearing. The facts surrounding their arrest were essentially uncontested at the hearing on the motion to suppress. Lewis and Starks were required to allege facts that indicated that the police officer's discovery of the guns and cocaine violated the Fourth Amendment. They alleged none. Neither Lewis nor Starks personally swore out any affidavits. The lone affidavit in support of the motion to suppress was prepared by Starks' attorney, who had no first-hand knowledge of the relevant events; it contains only conclusory allegations that the police lacked probable cause or a reasonable articulable suspicion of criminal activity when they arrested Lewis and Starks. In contrast, the government filed detailed affidavits sworn out by Officers Smith and Leedberg in support of its opposition to Lewis' and Starks' motion to suppress.

In sum, the affidavit in support of Lewis' and Starks' motion to suppress does not allege facts that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. Thus, the district court was completely justified in refusing to hold an evidentiary hearing where the factual matters were essentially uncontested.

### II. The motion to suppress

Lewis and Starks contend that the contraband the police officers confiscated from the parking lot should have been excluded as the fruit of an unlawful, warrantless search. Specifically, Lewis and Starks assert that the police seized them without probable cause immediately after they left Pete & Mary's Bar and that this seizure occurred before the officer allegedly observed them abandon the guns and cocaine.

First, we agree with the government that Lewis and Starks lacked standing under the Fourth Amendment to challenge the search. Moreover, even assuming *arguendo* that Lewis and Starks had standing, we find that the search satisfied the requirements of the Fourth Amendment.

While we review the district court's findings of fact on a motion to suppress for clear error, we review questions of law *de novo*. *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994). "This phenomenon sets the stage for a more nuanced statement of appellate practice in Fourth Amendment cases." *Id.* Though we treat the factual findings

with deference, we "[subject] the trial court's ultimate constitutional conclusions to plenary oversight."

*Id.*

### A. Standing

 The Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy. *United States v. Cruz Jiménez,* 894 F.2d 1, 5 (1st Cir.1990) (citing *Rakas v. Illinois,* 439 U.S. 128, 140–50, 99 S.Ct. 421, 428–34, 58 L.Ed.2d 387 (1978)). Such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis.[1] *Cruz Jiménez,* 894 F.2d at 5 (citing *United States v. Salvucci,* 448 U.S. 83, 90–91, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980)). "What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). "Essentially, . . . to prove a Fourth Amendment violation, [a defendant] must demonstrate not only that he exhibited a subjective expectation of privacy, but also that his expectation was justifiable under the attendant circumstances." *Cruz Jiménez,* 894 F.2d at 5 (citing *United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988)). The defendant bears the burden of persuasion on this issue. *Cruz Jiménez,* 894 F.2d at 5 (citations omitted).

 A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to claim that they were illegally searched or seized. *United States v. Sánchez,* 943 F.2d 110, 113 (1st Cir.1991); *see also United States v. Pierce,* 959 F.2d 1297, 1303 (5th

Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992) (holding that a defendant lacked standing to object to a search because he never at any point during the trial or appeal "attempted to establish, much less prove, any privacy interest in the [contraband]").

 Lewis and Starks lacked standing to protest the police officers' search of the parking lot because they failed to assert any privacy interest in the seized contraband. It may well be that Lewis and Starks had a reasonable expectation of privacy in the contraband, but if so, they failed to assert it in support of their motion to suppress. Neither Lewis nor Starks personally swore out any affidavits with respect to such an expectation. Rather, the lone affidavit in support of their motion to suppress was prepared by Starks' attorney, who had no first-hand knowledge of the relevant events. Moreover, this affidavit contains only conclusory allegations that the police lacked probable cause or a reasonable articulable suspicion of criminal activity when they arrested Lewis and Starks. We appreciate that Lewis and Starks may have feared that any interest they may have claimed in the contraband would be used against them at trial; however, "it has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." *United States v. Garcia–Rosa,* 876 F.2d 209, 219 (1st Cir.1989) (citing *Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968)). Lewis' and Starks' only interest in suppressing the contraband appears to be to avoid its evidentiary force against them; this is not an interest protected by the Fourth Amendment.

Although we find that Lewis and Starks lack standing to raise a Fourth Amendment challenge, we note that in any event the search satisfied the Fourth Amendment un-

---

**1.** "This inquiry is often referred to as a 'standing' issue, although it is not an inquiry that serves the function of traditional standing doctrine, which is to enable a federal court to determine whether there is such case or controversy that it may take jurisdiction of under Article III." *Cruz Jiménez,* 894 F.2d at 5 n. 1 (citations omitted). The concept of standing under the Fourth Amendment refers to the defendant's burden of proving a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct. *United States v. Sánchez,* 943 F.2d 110, 113 n. 1 (1st Cir.1991). "We therefore use the term 'standing' somewhat imprecisely to refer to this threshold substantive determination." *Id.*

der the doctrines of abandonment and plain view.

## B. Abandonment

When a defendant abandons property before a "seizure" occurs, the Fourth Amendment is not implicated because the property is not the fruit of an illegal search and seizure. *California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991). An arrest requires "either physical force ... or, where that is absent, submission to the assertion of authority." *Id.* at 626, 111 S.Ct. at 1551 (emphasis in original). The police have made an assertion of authority only if their words and actions would have caused an average citizen to believe he was not free to leave. *Id.* at 628, 111 S.Ct. at 1551–52 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). In *Hodari*, a police officer was chasing the defendant and, moments before the officer tackled him, the defendant tossed a rock of cocaine from his person. *Id.* at 623, 111 S.Ct. at 1549. The Court held that, "assuming that [the officer's] pursuit ... constituted a 'show of authority' enjoining [the defendant] to halt, since [he] did not comply with that injunction he was not seized until he was tackled." *Id.* at 629, 111 S.Ct. at 1552. Thus, the cocaine abandoned during the course of the chase was not the fruit of a seizure.

We follow *Hodari* and find that, even if the Brockton Police had made a show of force when they approached Lewis and Starks in the D'Angelo's parking lot, Lewis and Starks abandoned the contraband before they submitted to official authority. The district court expressly found that Lewis and Starks bent down and straightened up near the brown Buick before the police announced themselves and then pat-frisked Lewis and Starks. Thus, though Lewis and Starks eventually submitted to the police officers, this submission occurred after they had abandoned the contraband. Consequently, the motion to suppress was properly denied under the doctrine of abandonment.

## C. Plain View

The "plain view" doctrine allows the police to seize evidence without a warrant so long as (1) the evidence is in "plain view," (2) the police are legitimately on the premises where the evidence is seized, and (3) the evidence is immediately and apparently connected to the criminal activity. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971).

Lewis and Starks do not contest the fact that the guns and cocaine were in plain view and their connection to criminal activity was immediate and apparent when the officers seized them. Rather, Lewis and Starks contend that the police were not legitimately in the parking lot where the evidence was seized.

The district court found that the police officers were legitimately in the parking lot and that they had the "reasonable articulable suspicion" necessary to justify an investigatory stop under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *see also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (holding that a *Terry* stop was justified when an informant told a police officer that an individual in a nearby vehicle was carrying drugs and weapons). The record amply supports this conclusion. The district court found that a reliable confidential informant had told the Brockton Police that Lewis and Starks were carrying contraband in Pete & Mary's Bar. Officer Leedberg's affidavit established that the informer had previously provided information that led to the arrest of twelve defendants in seven criminal cases in the Brockton District Court. Further, during the course of their surveillance outside Pete & Mary's Bar, the police officers were able to corroborate some portions of the confidential informant's tip. Specifically, the officers were able to verify that the informer had been inside the bar and was thus in a position to see that Lewis and Starks were in possession of firearms. The surveillance also allowed the officers to observe that Lewis and Starks were dressed as the informer had described. Consequently, the informer's tip, coupled with the informer's previous reliability and the corrobo-

ration provided by police observations, justified an investigatory stop. Thus, because we agree that the police were legitimately in the parking lot and because the guns and cocaine were in plain view and their connection to criminal activity was apparent, the officers properly seized the evidence.

### III. The confidential informant's identity

Lewis and Starks assert that the district court erroneously denied their motion to disclose the identity of the confidential informant. Specifically, they contend that the informant played a material role in their arrest and that his testimony was vital because it pertained to their defense and could "amplify, contradict, or clear up" the Government's evidence.

■ We review the district court's decision not to disclose the identity of a confidential informer under an abuse of discretion standard. *See United States v. Jackson,* 918 F.2d 236, 240 (1st Cir.1990).

The courts have long recognized that the Government has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* This privilege, however, is not absolute. *Id.* at 60–61, 77 S.Ct. at 627–28. "Where the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.*

■ The resolution of this issue depends on the particular circumstances of each case. *Id.* at 62, 77 S.Ct. at 628–29. The trial court must balance the public interest in protecting the flow of information against the

individual's right to prepare his defense. *Id.* In so doing, it should take into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Id.* The burden is on the defendant to demonstrate that the circumstances demand disclosure; "[mere] speculation ... is not sufficient to meet the heavy burden which rests on an accused to establish that the identity of a confidential informant is necessary to his defense." *United States v. Giry,* 818 F.2d 120, 130 (1st Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987) (quoting *United States v. Skeens,* 449 F.2d 1066, 1070 (D.C.Cir.1971)). Where the informant is a "mere tipster," as opposed to an active participant in the offense charged, disclosure is required only in the exceptional case where it is vital to a fair trial. *United States v. Batista–Polanco,* 927 F.2d 14, 19 (1st Cir. 1991) (citing *Giry,* 818 F.2d at 130).

Lewis and Starks argue that the informant was more than a mere tipster and that his testimony was vital to their defense, in that he provided the police with the information that resulted in their arrest. They imply that the informant may have even "set them up." They list a number of questions that were unanswered due to the district court's refusal to require disclosure of the informant. These include questions concerning the nature of the relationship, if any, between the informer and Lewis and Starks and whether the informer harbored a personal grudge against them. Consequently, they conclude that the informer's absence precluded a fair trial. We disagree.

■ The district court properly refused to order disclosure of the informant's identity. The record indicates that the informant was merely a tipster in the arrest of Lewis and Starks. The informer simply spoke with the police, first by telephone and then in person, to inform them that Lewis and Starks were carrying firearms in Pete & Mary's Bar. The arrest then occurred approximately twenty minutes after the police last spoke with the informer. The informer was not present at the scene of the arrest in the parking lot and, thus, was in no position

to amplify, contradict, or clear up the testimony of any government witness.

Moreover, there is ample evidence to refute any "frame up" theory. Though the informer told the officers that Lewis and Starks would be leaving through the front door of Pete & Mary's Bar, he did not tell them that Lewis and Starks would proceed to the D'Angelo's parking lot. Thus, because he did not tell the police where Lewis and Starks would go upon leaving Pete & Mary's Bar, the informant could not have controlled when or where the arrest would occur. Furthermore, the police officers never saw the informer in the D'Angelo's parking lot. This makes it virtually impossible that the informer planted the contraband, especially in light of the fact that the officers saw Lewis and Starks attempting to hide it. Thus, we find that the district court did not abuse its discretion when it denied the motion to disclose the informer's identity.

## IV. The missing witness instruction

■ Lewis and Starks contend that the district court erred when it refused to issue a missing witness instruction with regard to the confidential informant. Specifically, they argue that the instruction was necessary because the informant was a witness in the government's exclusive control whose testimony would have been relevant and noncumulative. We review the court's refusal to give such an instruction for an abuse of discretion. *See United States v. St. Michael's Credit Union,* 880 F.2d 579, 597 (1st Cir.1989) (citations omitted).

■ "[T]he failure of a party to produce available evidence that would help decide an issue may justify an inference that the evidence would be unfavorable to the party to whom it is available or [to] whom it would ordinarily be expected to favor." *St. Michael's Credit Union,* 880 F.2d at 597 (quoting 2 C. Wright, *Federal Practice and Procedure* § 489 (1982)). A missing witness instruction is appropriate when its proponent demonstrates that the absent witness would have been (1) "favorably disposed" to testify in the government's behalf, (2) "peculiarly available" to the government, or (3) in the "exclusive control" of the government. *Unit-*

*ed States v. Welch,* 15 F.3d 1202, 1214–15 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994) (citing *St. Michael's Credit Union,* 880 F.2d at 597). When deciding whether to issue a missing witness instruction, the judge should consider whether the witness could provide "relevant, noncumulative testimony." *See United States v. Ariza–Ibarra,* 651 F.2d 2, 16 (1st Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *see also Welch,* 15 F.3d 1215 n. 17.

In a similar situation, we upheld the district court's refusal to issue a missing witness instruction with regard to an undisclosed confidential informant. *United States v. Martinez,* 922 F.2d 914, 925 (1st Cir.1991). In *Martinez,* the informer had witnessed prior drug transactions in the apartment where the defendants were eventually arrested. However, we found that the informer was a mere tipster because he was not present during the drug transaction which constituted the sole basis for the prosecution and thus "was not in a position to amplify, contradict, or clear up any inconsistencies in the government witnesses' testimony...." *Id.* at 921. We then concluded that a missing witness instruction would have been improper because, as a mere tipster, the informant was unessential to the defendant's right to a fair trial. *Id.* at 921, 925. Specifically, we held that where "a defendant's right to a fair trial is not jeopardized by the government's refusal to disclose its informant's identity, the exercise of that prerogative can *never* give rise to a negative inference suggesting that the informant's testimony would have been unfavorable." *Id.* (emphasis added). We further noted that an adverse inference was especially unjustified when the government's decision not to reveal the identity of its confidential informant was prompted only by its "concern for the informant's safety and anonymity...." *Id.*

■ We find the reasoning of the *Martinez* court to be controlling here. As we concluded above, the informer was a mere tipster whose absence did not jeopardize Lewis' and Starks' right to a fair trial. Per *Martinez,* this conclusion renders a missing witness instruction inappropriate. Further-

more, given the violent background of Lewis—three prior convictions for armed robbery—the government's concern for the informer's safety was justified. Moreover, as in *Martinez,* Starks used his summation to argue an adverse inference from the absence of the confidential informant. *Id.* Thus, we find that the district court did not abuse its discretion when it refused to issue the missing witness instruction.

## V. Cross-examination of Officer Noone

Lewis and Starks claim that the district court improperly limited their cross-examination of Officer Noone. As an expert witness for the government, Officer Noone offered testimony regarding the distribution and value of crack cocaine, as well as the use of weapons by alleged dealers of crack cocaine. Lewis and Starks claim that the district court improperly refused to allow them to cross-examine Officer Noone regarding the correct and preferable law-enforcement procedures to be used when investigating and prosecuting a narcotics case. Through this cross-examination, Lewis and Starks were attempting to show that they were the victims of a sloppy and botched investigation. They claim that they were prejudiced by these allegedly improper limits because "the jury was unable to realize the numerous police errors that permeated this case...."

■ We review a district court's limitations on cross-examination for an abuse of discretion. *United States v. Twomey,* 806 F.2d 1136, 1139–40 (1st Cir.1986). "A defendant's right to cross-examine is fundamental and demanding of great respect, *Alford v. United States,* 282 U.S. 687, 691–92, 51 S.Ct. 218, 219–20, 75 L.Ed. 624 (1931); however, a trial judge retains wide latitude to impose reasonable limits in order to avoid prejudice to a party or confusion of the issues." *Twomey,* 806 F.2d at 1139 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)).

■ The district court gave Lewis and Starks wide latitude to impeach Officer Noone's credibility with questions about general investigatory procedures. The court, however, limited Lewis' and Starks' cross-examination when they attempted to elicit testimony on matters that were cumulative, irrelevant, outside the scope of direct, or outside Officer Noone's personal knowledge and expertise.

For instance, Officer Noone was not involved in the surveillance and investigation that led to the arrest of Lewis and Starks. Thus, the court was within its discretion when it excluded questions on the actual procedures involved in the present case.[2] The court also acted within its discretion when it excluded a question concerning whether it is preferable to use controlled drug buys and electronic surveillance before accusing a defendant of being a drug dealer. Although Officer Noone's knowledge of various police procedures or lack thereof may have been relevant to impeach his credibility as an expert witness, the district court had already given the defendants considerable latitude to accomplish this. Thus, because these procedures were not used in this case, this hypothetical was too far removed from the facts at hand. The court likely decided to cut off this speculative line of questioning because it was so marginally relevant and because the defense counsel could have proceeded to ask Officer Noone about dozens of procedures that the police could have used in this case, leading to interminable unrelated speculation and confusion.

We have carefully reviewed Lewis' and Starks' other specific contentions and find them similarly meritless.

## VI. Prosecutorial misconduct

### A. Comment on the "frame-up" theory

■ Lewis and Starks assert that the government improperly commented on their failure to produce any evidence regarding an alleged "frame up" orchestrated by the confidential informant. Whether the prosecutor's comments were improper is reviewed de novo; whether the misconduct, if any, de-

---

2. These questions included whether the police had made controlled drug buys or had used electronic surveillance during the investigation and how Starks was dressed when he was arrested.

mands a new trial is reviewed for an abuse of discretion. *United States v. Glantz*, 810 F.2d 316, 320 n. 2 (1st Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

■ Though it is axiomatic that the government cannot comment on a defendant's failure to take the stand, *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), "the government is entitled, to some extent, to comment on a defendant's failure to produce evidence supporting the defense theory of the case." *Glantz*, 810 F.2d at 321 (citing *United States v. Savarese*, 649 F.2d 83, 87 (1st Cir.1981)). In *Glantz*, the prosecutor remarked that the defendant had failed to produce records supporting its contention that the alleged kickbacks were actually legitimately earned legal fees. *Glantz*, 810 F.2d at 320–24. We found that the arguments were not such that a jury would naturally and necessarily take them to be comments on the defendant's failure to testify. Rather, the arguments highlighted weaknesses in the defense's theory—the primary weakness was, in fact, the absence of business records supporting this theory. *Id.* at 322–23. Having put forth a theory in defense, a defendant cannot expect the government to refrain from commenting on its deficiencies. *See id.* at 321.

■ Here, Lewis and Starks assert that the government improperly commented on the lack of evidence suggesting that the informer had framed Lewis and Starks by planting the contraband in the parking lot. In closing, the government argued:

> Now, you heard at the beginning of this case, the very beginning of this case ... that somebody framed these defendants. That's what was stated to you. Somebody framed the defendants. Now, what are you hearing? You're hearing, well—first of all, what evidence has there been on that? None. What evidence has come to you wherein you would say, "Yeah, I think they were framed?"

Lewis and Starks contend that this was an impermissible comment on their failure to testify. We disagree. Both Lewis and Starks raised the possibility that they had been framed by the confidential informant. Starks raised the "set up" defense in his opening statement. Though Lewis never explicitly asserted it, he insinuated that the confidential informant had indeed planted the contraband.[3] Lewis and Starks failed to offer any evidence whatsoever that would even remotely support this theory. Given this, we believe the government's closing statement was a permissible comment on the weakness of the frame-up theory alleged by the defense and did not constitute prosecutorial misconduct.

### B. The "paid informant" issue

Starks contends that the government improperly undermined his counsel's credibility when the government demonstrated at trial that the informant was not a paid informant after the government had previously represented to Starks that he was a paid informant. In a pretrial conference, the government stated that it "believe[d] ... the Brockton Police do not have the confidential informant signed up as a paid, working informant; that on occasion they give him a few bucks here and there and he provides ... information to the Brockton Police." Starks asserts that his counsel relied on this statement in preparing his trial strategy. Apparently, Starks intended to demonstrate that the informant had a monetary incentive to "produce" criminals for the police. Starks claims that the government undermined his credibility and, indeed, his entire trial strategy, when it elicited testimony from Brockton Police officers that these officers had never paid the informant and that they were not aware that any other law enforcement personnel had made such payments.

As a preliminary matter, we note that Starks failed to raise this objection at trial in a specific and timely manner; he neither objected nor moved for a mistrial or new trial—rather, he merely raised some vague concerns in a sidebar conference. Conse-

---

**3.** This insinuation is most clear in Lewis' cross-examination of Officer Leedberg. When Officer Leedberg stated that he frequently searches informants prior to a "controlled buy," Lewis' counsel asked, "And that's to make sure that the person that you're dealing with [the informant] is not planting contraband on the people you're going to arrest, is that right, sir?"

quently, we must review for plain error. Fed.R.Crim.P. 52(b); *see also United States v. Romero,* 32 F.3d 641, 651–52 (1st Cir. 1994).

 We will find plain error only when (1) there is an "error," (2) that is "clear" or "obvious" and (3) that affects "substantial rights." *United States v. Olano,* —— U.S. ——, —— – ——, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993); *United States v. Colón–Pagán,* 1 F.3d 80, 81 (1st Cir.1993). In this case, there is no error, much less plain error. Starks fails to express any legal theory which supports his claim that he was denied a fair trial. Consequently, per standard appellate procedure, we are tempted to deem it waived. *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). As we have previously noted, "[i]t is not enough to mention an argument in the most skeletal way, leaving the court to do the counsel's work, create the ossature for the argument, and put flesh on its bones." *Id.* Moreover, and more importantly, Starks' argument is factually infirm. While Starks contends that his trial strategy was to discredit the informant by demonstrating that he had a monetary incentive, he neglected to pursue this theory during his cross-examination of all the police officers who took the stand. Not only does this undermine Starks' contention that this was his trial strategy, it also demonstrates that the government's pretrial statements might have been factually accurate. The government stated that Brockton Police occasionally gave the informant "a few bucks here and there." Thus, by failing to explore this line of questioning thoroughly, Starks did not demonstrate that the government's pretrial statement was indeed false.[4] In sum, we find that Starks has asserted no factual or legal proposition that satisfies the plain error standard.

---

4. Moreover, we note that this was merely a statement of belief by the government. Starks never stated that he intended to rely on it; further, he did not attempt to confirm it with pretrial discovery. In short, Starks did very little to shore up what he claims was his primary trial strategy.

## VII. Admission of the photographs

 Lewis and Starks assert that the district court improperly admitted an "unduly suggestive array of photographs." Over objection, the court admitted a folder consisting of Lewis' and Starks' booking photographs stapled alongside photographs of the guns and cocaine discovered near them. Lewis and Starks contend, and with some merit, we think, that the array of photographs was unfairly prejudicial because it suggested an as-yet unproven connection between them and the contraband. That is, the arrays depicted the ultimate legal conclusion, that Lewis and Starks possessed cocaine and firearms, that was the government's burden to prove.

 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Relevant evidence is generally admissible. Fed.R.Evid. 402. However, a judge may exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Fed.R.Evid. 403. We review a trial court's Rule 401/403 balancing test for an abuse of discretion, and only in "extraordinarily compelling circumstances" will we reverse a district court's "on-the-spot judgment" concerning the probative value and unfair effect of the proffered evidence. *United States v. Rodríguez–Estrada,* 877 F.2d 153, 155–56 (1st Cir.1989). While we are concerned with the government's trial tactic, we find that the error, if any, was harmless in light of the strong case presented by the government.[5] *United States v. Ruiz–Batista,* 956 F.2d 351, 352–53 & n. 2 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992) (noting that reversal is inappropriate where other evi-

---

5. We think that prosecutors ought to bear in mind that where, as here, the government has a strong case, such arguably prejudicial tactics do not help the government but do create the risk that sufficiently egregious conduct will constitute grounds for reversal. Conversely, where the case is a close one, error will not be deemed harmless and the conviction will be reversed.

dence of guilt renders an evidentiary error harmless).

Here, the photos were relevant. They show the condition of the evidence when it was recovered. However, we do not conclude whether the danger of unfair prejudice presented by the photographic array substantially outweighed its probative value because the error, if any, in admitting the array was ultimately harmless. The array may have prematurely connected Lewis and Starks to the contraband. However, the jury was informed of how the array was compiled. Thus, it could not have concluded that Lewis and Starks possessed the contraband simply because their photographs were stapled alongside photographs of the contraband. Further, the government eventually presented overwhelming evidence to connect Lewis and Starks to the guns and cocaine depicted in the array. Lewis and Starks were standing alongside the vehicles under which the police found the contraband. Moreover, Officer Smith testified that, moments before the arrest, he saw both Lewis and Starks make furtive movements as if they were attempting to hide something under the vehicles. Consequently, we do not find any reversible error.

## VIII. Failure to produce exculpatory evidence

Lewis and Starks contend that the Brockton Police Department mishandled their case in so severe a fashion that they were denied a fair trial. Specifically, they allege (1) that they were denied access to possibly exculpatory evidence when the Brockton Police erased audio tapes of the events surrounding their arrest, (2) that they were denied an opportunity to prove their frame-up theory when the Brockton Police delayed submitting the contraband for fingerprinting, and (3) that the Brockton Police colluded to produce a false and inaccurate police report.

■■■ A defendant has an established due process right to request and receive all material evidence in the government's possession. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). We recently discussed the framework of a defendant's constitutionally guar-

anteed access to evidence. *United States v. Femia,* 9 F.3d 990, 993 (1st Cir.1993). This framework reflects "the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight." *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984). "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* A defendant who seeks to suppress evidence formerly in the government's possession must show that (1) the government acted in bad faith when it destroyed the evidence, (2) the evidence possessed an apparent exculpatory value before it was destroyed, and (3) the missing evidence is, to some extent, irreplaceable. *Femia,* 9 F.3d at 993–94; *Trombetta,* 467 U.S. at 488–89, 104 S.Ct. at 2533–34; *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988). As we noted in *Femia,* the dispositive factor is often whether the defendant can demonstrate that the government acted in bad faith. *Femia,* 9 F.3d at 994.

■■■ The Internal Affairs Office of the Brockton Police records all radio transmissions made from police vehicles. The tapes of the transmissions between the officers involved with Lewis' and Starks' arrest were subsequently recorded over before Lewis and Starks had a chance to review them. With regard to these surveillance tapes, Officer Leedberg offered testimony concerning the routine procedures followed by the Brockton police. Generally, the Brockton Police Department only preserves audio tapes of radio communications for one or two months before recording over them unless the tapes pertain to a major crime such as murder. Lewis and Starks proffered no evidence to the trial court that would even remotely suggest that the police acted in bad faith when they reused the audio tapes in accordance with their established routine.

■■■ Lewis and Starks also assert that the Brockton police made a crucial error when they allegedly delayed submitting the contraband for fingerprint analysis. Lewis

and Starks, however, fail to allege any governmental conduct that demonstrates that the alleged delay was due to bad faith rather than a normal error. Moreover, they do not make a colorable argument that the alleged delay destroyed evidence with an apparent exculpatory value. Starks asserts that the alleged delay cost him the opportunity to prove his frame-up theory by showing that the confidential informer's fingerprints were on the contraband. However, as we discussed in part III, there was ample evidence to refute and none to support the theory that the confidential informer framed Lewis and Starks.

▪ Finally, Starks claims that the Brockton Police colluded to produce a false and inaccurate police report. In support of this, he points to two alleged inaccuracies in the report. First, the report states that on August 15, 1992, Officer Leedberg conversed with the informer in person. At trial, Officer Leedberg testified that this conversation occurred by telephone. Second, Starks states the police report conflicts with the trial testimony regarding whether the guns and cocaine were found under two separate vehicles or whether they were all found under the brown Buick. Starks, however, fails to demonstrate that these alleged factual inaccuracies resulted from bad faith. He merely states that "these errors poisoned the judicial process" and thus constitute grounds for reversal. We cannot agree. No police investigation is entirely perfect, and minor inconsistencies do not support his contention that the Brockton Police used bad faith and colluded to produce a false and inaccurate police report.

Thus, we find no reversible error in the government's alleged mishandling of the evidence.

## IX. The government's peremptory challenge

▪ Lewis and Starks contend that the government's peremptory challenge of a black juror was racially motivated and, consequently, violated their rights under the Equal Protection Clause of the United States Constitution. Starks also contends that the court further erred in refusing his request to question the juror on his ability to render an impartial verdict.

In *Batson,* the Supreme Court delineated a three-step process to determine whether the government's peremptory strike was motivated by an impermissible racial bias. *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–24, 90 L.Ed.2d 69 (1986). First, the defendant must make a *prima facie* showing of racial discrimination. *Id.* To clear this initial hurdle, the defendant must first show that "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* Second,

> the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia,* 345 U.S. 559, 562 [73 S.Ct. 891, 892, 97 L.Ed. 1244] (1953). Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen ... on account of their race. This combination of factors in the empaneling of the petit jury ... raises the necessary inference of purposeful discrimination.

*Id.* at 96, 106 S.Ct. at 1723. The court should consider all relevant factors to determine whether the defendant has made the requisite prima facie showing. *Id.* at 96–97, 106 S.Ct. at 1722–23.

▪ Once the defendant successfully clears this initial hurdle, the prosecutor must then articulate a race-neutral explanation for striking the juror in question, though "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723. The trial court then must decide whether the defendant has established purposeful discrimination. *Id.*

In the case at bar, we are dubious that Lewis and Starks have alleged facts necessary to establish the requisite *prima facie* case. Regardless of this, we are certain that the prosecutor's race-neutral explanation ne-

gates any inference of purposeful discrimination.

As to the first issue, the venire started with three black jurors. The government and Starks each excused one of the black jurors with peremptory challenges. The third was selected for trial despite the fact that the government still had two peremptory challenges remaining. In light of the fact that Starks removed one black juror and that the government allowed the court to empanel the third black juror, we doubt whether Lewis and Starks have alleged facts sufficient to raise the necessary *prima facie* inference of purposeful discrimination. *See Chakouian v. Moran*, 975 F.2d 931, 934 (1st Cir.1992) (holding that defendant failed to demonstrate *prima facie* case absent any evidence as to whether other black members of venire were called and seated as jurors). Regardless, we are certain that the prosecutor articulated a satisfactory race-neutral explanation for the challenge. The prosecution informed the court that it challenged the juror because he worked as a security guard at Straughter Security, a firm which the Bureau of Alcohol, Tobacco and Firearms ("ATF") was actively investigating for possible firearms offenses. The ATF investigation entailed an "active federal presence" at the company as well as grand jury testimony by certain security guards. Under these circumstances, the government was rightfully concerned that the security guard may harbor certain hostilities due to the investigation of his employer and was entitled to question the juror's ability to render an impartial verdict. Consequently, the use of the peremptory challenge was permissible. Further, in light of the government's satisfactory explanation, the district court acted well within its discretion when it refused Starks' request to continue questioning the juror.

## X. Refusal to stipulate that defendants were felons

 The government charged both Lewis and Starks with being a felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1). To prove this charge, the government must show that (1) the defendant was previously convicted of an offense re-

quiring imprisonment exceeding one year and (2) he knowingly possessed a firearm in or affecting interstate commerce. *United States v. Wight*, 968 F.2d 1393, 1397 (1st Cir.1992). Lewis had three prior convictions for armed robbery and offered to stipulate that he was a felon to satisfy the first element of the statute, presumably to keep the nature of his prior felonies from the jury. Starks had a prior state court conviction for possession of cocaine with intent to distribute, and made a similar offer to stipulate that he was a felon. The district court did not require the government to accept either Lewis' or Starks' proposed stipulation but rather allowed the government to introduce evidence of the nature of Starks' conviction and one of Lewis' convictions. The government then introduced a certified copy of Starks' prior conviction for possession of cocaine with intent to distribute and Lewis' prior conviction for "armed robbery while masked." Though the government mentioned the convictions briefly in its opening and closing statements, the court prevented the government from introducing evidence concerning the facts surrounding the convictions.

Lewis and Starks contend that, in light of our recent decisions in *Tavares* and *Melvin*, the district court erroneously refused to accept their offers to stipulate that they were felons under the statute. *United States v. Tavares*, 21 F.3d 1 (1st Cir.1994) (en banc); *United States v. Melvin*, 27 F.3d 703 (1st Cir.1994). They further contend that this refusal constitutes reversible error. We agree with Lewis' and Starks' first contention but find the error to be harmless in light of the overwhelming evidence of guilt.

 Before *Tavares*, the government, even in the face of an offer to stipulate, was allowed to "present evidence on the one felony necessary to prove the crime charged." *United States v. Collamore*, 868 F.2d 24, 28 (1st Cir.1989). It was under this rubric that the district court allowed the government to reject the offer to stipulate. However, we recently revisited this issue and determined that when a defendant is charged with being a felon-in-possession of a firearm, evidence of the nature of the prior conviction is not

admissible unless special circumstances establish that the relevance of the evidence is "sufficiently compelling to survive the balancing test of Fed.R.Evid. 403." *Tavares,* 21 F.3d at 5; *Melvin,* 27 F.3d at 707.[6]

▮ In light of the government's concession that this case does not present the "unusual circumstances" necessary to depart from the general rule announced in *Tavares,* we must determine whether the error was harmless. To do so, we "must assess the record as a whole to determine the probable impact of the evidence on the jury." *Melvin,* 27 F.3d at 708 (quoting *United States v. Spinosa,* 982 F.2d 620, 630 (1st Cir.1992) (citation omitted)). As we discussed in part VII, the government presented overwhelming and essentially uncontradicted evidence of Lewis' and Starks' guilt. Lewis and Starks were both caught with the proverbial "smoking gun." The police recovered the guns and cocaine moments after witnessing Lewis and Starks attempt to discard the contraband under cars parked alongside them. The conclusiveness of this evidence renders harmless the district court's erroneous admission of the nature of the predicate felony.

## XI. The length of the sentences

### A. Base offense level

Lewis and Starks contend that the district court improperly aggregated the controlled substances that were held by them individually when the court determined the appropriate base offense level ("BOL"). This contention is erroneous.

▮ The determinative factor for sentencing under the guidelines is the quantity of drugs. *United States v. Reyes,* 3 F.3d 29, 31 (1st Cir.1993). For sentencing purposes, the government must prove the quantity by a preponderance of the evidence. *Id.* This quantity is the sum of the charged conduct plus the defendant's "relevant conduct." *Id.* In the case of jointly undertaken criminal activity (regardless of whether a conspiracy was charged), relevant conduct includes "all

reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity." U.S.S.G. § 1B1.3(a)(1)(B). Determining quantity under the guidelines is a matter entrusted to the sound discretion of the district court. *United States v. Osorio,* 929 F.2d 753, 764 (1st Cir.1991). Thus, we will only reverse on a finding of clear error. *Id.*

▮ Lewis and Starks assert that the court committed clear error when it found that they acted in concert and consequently aggregated the amount of cocaine that each held individually. They are wrong. The evidence, especially the Presentence Investigation Report ("PSR"), supports the district court's decision that Lewis and Starks were engaged in a joint activity. Lewis and Starks were together at Pete & Mary's Bar for two consecutive nights. On the second night, they both brought along loaded handguns and similar containers of identically wrapped crack cocaine. When the police approached, Lewis and Starks both discarded their contraband under parked cars. Moreover, Starks attempted to create a diversion by waving his arms, presumably to give Lewis more time to stash his contraband. These facts support a finding that Lewis and Starks were engaged in a joint activity such that the court could correctly attribute to each defendant the cocaine held by the other under the heading of relevant conduct.

### B. Starks' Criminal History Category

Starks also contends that the district court made two errors when it calculated his criminal history, thus increasing his exposure under the guidelines. He first asserts that the court improperly assessed two points for a prior drug conviction because he served less than the guideline minimum prison term of sixty days. Next, he argues that the court improperly counted his "admission to sufficient facts" for a battery on a police officer. He contends that scoring this charge was erroneous because no finding of guilt was ever made and the case was ultimately dismissed.

---

**6.** Because we decided *Tavares* while the present case was still pending on direct review, we apply it here. *Melvin,* 27 F.3d at 706 n. 4.

▇ We employ a dichotomous process to review a district court's application of the sentencing guidelines. *United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992). First, we examine the scope of a guideline provision *de novo*. *Id.* (citations omitted). Once we have determined whether the relevant guideline provision applies, we review the factfinding process only for clear error.

*Id.*

To determine a sentence under the guidelines, the court must first calculate the defendant's criminal history category. This system is based on the premise that "repeated criminal behavior will aggravate the need for punishment with each recurrence." U.S.S.G. § 4, intro. comment.

▇ On a prior drug conviction, Starks was sentenced to serve five months in a House of Correction. The execution of his sentence was stayed while he appealed. The court then granted him credit for 39 days served and released him on parole. Starks asserts that the district court improperly assessed two criminal history points for this conviction because he served less than the sixty day sentence specified in the guidelines. We disagree. The guidelines instruct the court to add two points for "each prior *sentence of imprisonment* of at least sixty days...." U.S.S.G. § 4A1.1(b) (emphasis added). The application notes clarify any possible ambiguity by stating that "criminal history points are based on the sentence pronounced, not the length of time actually served." U.S.S.G. § 4A1.2, comment. (n. 2); *see also United States v. DePriest*, 6 F.3d 1201, 1215 (7th Cir.1993); *United States v. Shinners*, 892 F.2d 742, 743–44 (8th Cir. 1989); *United States v. Altman*, 901 F.2d 1161, 1166 (2d Cir.1990). Here, the court had sentenced Starks to five months, well over the sixty day minimum in the guidelines. Thus, we find the district court's assessment of two criminal history points proper.

▇ We will now turn to the second issue. Starks contends that the district court should not have counted his "admission to sufficient facts" because it was not a diversionary disposition that involved a judicial finding of guilt or admission of guilt in open court.[7] We decline to rule on this issue because our decision cannot effect the length of Starks' sentence.

The district court assessed Starks a total of six criminal history points, placing him in category three. *See* U.S.S.G. ch. 5 pt. A. To achieve a sentence reduction, Starks needs to shed three points from his criminal history score; this would drop him down to category 2. *Id.* The district court only assessed one point for this "admission to sufficient facts." Thus, even if the assessment were improper, Starks would remain in category three, and his sentence would remain unchanged.

## XII. Lewis' challenges to his sentence

### A. Lewis' Equal Protection challenge

Lewis contends that the Federal Sentencing Guidelines' distinction between the "crack" and powder forms of cocaine violates the Equal Protection Clause of the United States Constitution. Specifically, he asserts that the distinction, though facially neutral, triggers heightened scrutiny under the *Feeney* test because it has both a racially discriminatory impact and intent. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). Alternatively, he contends that the distinction fails rational basis scrutiny.

▇ We recently addressed this issue and, like every other circuit that has done so, found the distinction in the guidelines between crack cocaine and powder cocaine to be constitutional. *See United States v. Singleterry*, 29 F.3d 733, 739 (1st Cir.1994). In *Singleterry*, we found the distinction did not merit strict scrutiny because there was insufficient evidence that the distinction "was mo-

---

7. Diversionary dispositions resulting from a finding or admission of guilt are counted as sentences under the guidelines even if a conviction is not formally entered. U.S.S.G. § 4A1.2(f). "Section 4A1.2(f) requires counting prior adult diversionary dispositions if they involved a judicial determination of· guilt or an admission of guilt in open court. This reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency." U.S.S.G. § 4A1.2 comment. (n. 9).

tivated by any racial animus or discriminatory intent on the part of either Congress or the Sentencing Commission." *Id.* at 741. (quoting *United States v. Frazier,* 981 F.2d 92, 95 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1661, 123 L.Ed.2d 279 (1993)). The distinction also survived rational basis analysis because "Congress had before it sufficient . . . information to make distinctions that would justify . . . more severe sentences for trafficking in or using cocaine base or crack than cocaine itself." *Singleterry,* 29 F.3d at 740 (quoting *Frazier,* 981 F.2d at 95). Accordingly, this challenge fails.

### B. Lewis' selective prosecution claim

Lewis asserts that the government adopted his case to federal court solely because of his racial status. In essence, he claims that he was selectively prosecuted because he is black.

■ A selective prosecution claim fails unless the defendant establishes that his prosecution results from "intentional and purposeful discrimination." *United States v. Bassford,* 812 F.2d 16, 19 (1st Cir.), *cert. denied,* 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987). This requires that the defendant demonstrate, "at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or based in bad faith, i.e., based upon such impermissible considerations as race. . . ." *Id.* (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)).

■ Lewis has failed to proffer any factual allegations that would substantiate his selective prosecution claim. Rather, Lewis merely points out that the government's adoption of his case to federal court greatly increased his potential prison sentence. Lewis has not demonstrated that others, similarly situated, were not proceeded against or that he was singled out for impermissible reasons. Lewis' crimes subjected him to prosecution in both federal and state court. The federal government chose to prosecute

him; we cannot conclude that he was selectively prosecuted solely because he was only charged in federal court.

### C. Lewis' request for downward departure

■ Lewis argues that the allegedly unusual circumstances of his case entitle him to a downward departure from the range specified in the guidelines. We lack jurisdiction to review a district court's refusal to depart downward from the sentencing range so long as the district court was aware of its authority to order such a departure. *United States v. Lombardi,* 5 F.3d 568, 571–72 (1st Cir. 1993) (citing *United States v. Lauzon,* 938 F.2d 326, 330 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991)). This area of the law is well settled. *See id.; United States v. Castiello,* 915 F.2d 1, 6 (1st Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991); *United States v. Tucker,* 892 F.2d 8, 9 & n. 2 (1st Cir.1989). However, it is unclear from the record whether the district court concluded that it lacked authority to order a downward departure or simply refused to exercise its discretion. Consequently, we assume that the district court believed it lacked the power to depart from the guidelines and review whether this assessment was accurate.

■ In *United States v. Rivera,* we reviewed the factors that often warrant departure, the factors that are ordinarily irrelevant to departure decisions, and those that are forbidden in determining whether to depart. 994 F.2d 942, 948–49 (1st Cir.1993). Lewis contends that several factors entitle him to a downward departure. First, Lewis asserts that departure was warranted because the distinction between the crack and powder forms of cocaine in the sentencing guidelines has a racially disparate impact. He also claims that departure is warranted because of the "discriminatory adoption of his case to federal court," alleged evidentiary errors and prosecutorial misconduct in the course of the trial, and the fact that he is an uneducated, young black man. We have already discussed the lack of foundation for Lewis' discriminatory prosecution claim, so this was

not proper grounds for departure. The trial was not sullied by any prejudicial evidentiary errors or prosecutorial misconduct—thus, these allegations do not justify a downward departure. As to the other factors asserted by Lewis, they fall into either the discouraged or forbidden categories reviewed by the *Rivera* opinion. Consequently, the district court correctly refused to order a downward departure when it calculated Lewis' sentence.

### D. The "crime spree" contention

Lewis asserts that the district court erroneously determined that he was an Armed Career Criminal under 18 U.S.C. § 924(e)(1), the Armed Career Criminal Act (the "ACCA"). The ACCA provides enhanced punishment for violating 18 U.S.C. § 922(g)—being a felon in possession of a firearm—if the defendant has three separate prior convictions for violent felonies or serious drug offenses. 18 U.S.C. § 924(e)(1). Such defendants are considered armed career criminals. U.S.S.G. § 4B1.4. The district court sentenced Lewis under the ACCA after it determined that his three prior armed robbery convictions satisfied its requirements. Lewis contends that his three prior convictions were not separate occurrences but, rather, were all part of a single, systematic course of conduct, or "crime spree," that should only count as one offense under the ACCA. Once again, he is wrong.

Lewis first robbed a gas station in March, then a cafe in July, and last a motel in August. Gas, food, and lodging—the connection would be apparent if the defendant were on a trip. However, the facts that Lewis robbed these places over a five-month time frame and used different weapons in each robbery amply support the district court's determination that the crimes did not constitute a single crime spree. *See United States v. Harris*, 964 F.2d 1234, 1237 (1st Cir.1992) (two assault and battery convictions involving same victim but occurring two months apart); *United States v. Gillies*, 851 F.2d 492, 497 (1st Cir.) (armed robbery convictions for offenses at two different drug stores on consecutive days, for which defendant received concurrent sentences), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

### XIII. Redaction of references to cocaine base

Lewis argues that the district court erroneously refused his request to strike the words "cocaine base" from the indictment. 21 U.S.C. § 841 makes it a federal crime to possess with an intent to distribute any of the "controlled substances" listed in 21 U.S.C. § 812. Though coca leaves and their derivatives are listed as controlled substances, the term cocaine base only appears in the penalty provision of 21 U.S.C. § 841. Thus, Lewis contends, at trial the term is irrelevant and highly prejudicial surplusage which should have been stricken from the indictment and, consequently, the district court's failure to do so precluded a fair trial. We cannot agree.

Under Federal Rule of Criminal Procedure 7(d), the defendant may move to strike surplusage from the indictment. This serves to protect the defendant "against immaterial or irrelevant allegations in an indictment, ... which may ... be prejudicial." Fed. R.Crim.P. 7(d), advisory committee note; *United States v. Fahey*, 769 F.2d 829, 841–42 (1st Cir.1985). This decision rests in the sound discretion of the district court. *Id.* at 842 (citations omitted). Here, the term cocaine base was neither irrelevant nor unfairly prejudicial. The indictment served as notice to Lewis of the nature of the charges against him. Indeed, identifying the substance as cocaine base was an essential element of the government's case against Lewis. Further, though the term crack cocaine probably carries heavy social baggage, Lewis' brief lacks any explanation of how the term *unfairly* prejudiced him. We find this claim altogether meritless.

We have considered the other claims of Lewis and Starks and find them equally meritless.

*Affirmed.*