USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1779 UNITED STATES OF AMERICA, Appellee, v. RICHARD ALSTON, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Reginald C. Lindsay, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Lois M. Lewis, by Appointment of the Court, for appellant. _____________ Paul G. Levenson, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ May 5, 1997 ____________________ BOUDIN, Circuit Judge. In the district court, Richard ______________ Alston was found guilty by a jury of being a convicted felon in possession of a firearm in violation of 18 U.S.C.  922(g)(1). On this well-argued appeal, Alston makes a number of claims of error. Most are readily answered, but one issue--what happens when the government alters evidence for arguably legitimate reasons but to the defendant's disadvantage--requires more extensive discussion. The background facts are not in dispute. At about 10 p.m. on November 13, 1992, two Boston police officers received a tip from a confidential informant that a man near 5 Fayston Street in Dorchester was carrying a gun. The informant advised that the man was black, and was dressed in jeans, a tan jacket and black baseball cap. The officers parked their unmarked car across the street a few doors away and saw Alston emerge from 5 Fayston Street wearing the clothing described by the informant. In plainclothes but with police badges around their necks, the officers left their car and approached Alston. According to the officers, Alston moved his left hand in the direction of his coat pocket (he denies this), and one of the officers grabbed Alston's arm and felt the outside of the pocket. Realizing that there was a gun in the pocket, the officer removed it and arrested Alston. -2- -2- The gun seized from Alston was later identified as a Colt Model 1908 .25-caliber, semi-automatic pistol. When seized, the weapon was rusted and pitted, and its slide was stuck. It contained no magazine, and Alston had no ammunition. The gun's grip was wrapped in electrical tape. It is the government's later alteration of this weapon that gives rise to the main issue in this case. Alston was first charged under Massachusetts law with possessing a firearm without a license and possessing a firearm with a defaced serial number. M.G.L. ch. 269,  10(a), 11C. Shortly thereafter, the state charges were dismissed because the Boston Police Department's ballistics unit had determined that the gun was inoperable and therefore did not meet the Massachusetts definition of a firearm. M.G.L. ch. 140, 121. The Boston Police then sent the gun to the U.S. Treasury Department's Bureau of Alcohol, Tobacco and Firearms ("ATF"). An ATF specialist used WD-40 oil and a rawhide mallet to free the slide. He also buffed and polished part of the gun in a vain attempt to determine the serial number. Another specialist then lubricated, disassembled and cleaned the gun, checked it for safety, reassembled it and test fired it. It appears that fruitless attempts were made to see whether through ballistics marks the weapon could be associated with any other crime. -3- -3- In November 1994, a federal grand jury indicted Alston under the felon-in-possession statute and also for possessing a firearm with an obliterated serial number in violation of 18 U.S.C. 922(k). The pertinent federal definition of a firearm is more expansive than the Massachusetts definition: It includes "any weapon . . . which . . . is designed . . . to expel a projectile by the action of an explosive." 18 U.S.C. 921(a)(3). Thereafter, the government dropped the serial number charge but proceeded on the felon-in-possession charge.  Alston tried unsuccessfully to suppress the gun as unlawfully seized, and later objected to its admission at trial because it had been altered by the government. Neither effort was successful. The gun, and testimony that it had been test fired, were provided at trial; the jury was also told how the gun had been refurbished. The jury convicted Alston in July 1995 after a short trial.  In June 1996, Alston was sentenced to 188 months in prison and three years of supervised release pursuant to the Armed Career Criminal Act. 18 U.S.C. 924(e). That statute provides for a minimum sentence of 15 years if the defendant has previously been convicted of three violent felonies. Alston had prior Massachusetts felony convictions for manslaughter in 1965, assault and battery with a dangerous weapon in 1968, and armed robbery in 1975. -4- -4- On appeal, Alston's first claim is that the district court erred in refusing to suppress the gun as the product of an unconstitutional search and seizure. Alston's initial motion to suppress, inadequately supported, had been denied by margin order. See United States v. Lewis, 40 F.3d 1325, ___ ______________ _____ 1334-35 (1st Cir. 1994). But thereafter, Alston filed a motion to reconsider accompanied by an affidavit setting forth Alston's version of events. (The government had previously provided affidavits of police officers attesting to the tip and the reliability of the unidentified informant based on prior accurate tips.)  Alston's affidavit said in substance that he had been moving a refrigerator with a friend and had tossed his coat onto the porch of the house. As he lifted the refrigerator, something fell out onto the pavement and, in the dark, Alston threw it onto the porch. When he moved the refrigerator into the house and returned to the porch, the police approached him as he was starting to put on his coat, patted him down and took the firearm from his pocket. Alston's affidavit admits that the "something" he picked up "turned out" to be the firearm; he does not say how it got into his coat pocket. After Alston filed his affidavit, the district court reconsidered the suppression request but again refused to suppress. The judge ruled that assuming Alston's version of events to be accurate, the police still had reasonable -5- -5- suspicion based on the informant's information to conduct a Terry stop. See Terry v. Ohio, 392 U.S. 1, 21-22 (1968). _____ ___ _____ ____ Reasonable suspicion was established, said the judge, because the confidential informant had given reliable information in the past; and before stopping Alston, the police were able to confirm the informant's description of Alston at the location given by the informant. Although review of this appraisal is plenary, United ______ States v. Mendez-De Jesus, 85 F.3d 1, 2 (1st Cir. 1996), the ______ _______________ district court was clearly correct in saying that reasonable suspicion for a Terry stop was created by such a tip from a _____ previously reliable informant. See Adams v. Williams, 407 ___ _____ ________ U.S. 143, 146-47 (1972); Lewis, 40 F.3d at 1334-35. And _____ whether or not Alston reached for his pocket, the pat-down search was justified because the police had a reasonable suspicion that Alston might be armed. See United States v. ___ ______________ Schiavo, 29 F.3d 6, 8-9 (1st Cir. 1994). _______ We turn now to the issue that poses the chief difficulty, namely, Alston s properly preserved claim that the altered gun should have been excluded from evidence at trial. Alston's argument is that the refurbishments rendered the evidence substantially more prejudicial than probative, warranting exclusion under Fed. R. Evid. 403; alternatively, he argues that the government deliberately deprived Alston of -6- -6- exculpatory evidence in violation of the Due Process Clause of the Fifth Amendment. Alston does not dispute that the gun was at all times a firearm under the federal statute. His main objection to the government's alterations to the weapon, although perhaps not his only objection, is that they tended to undermine his claim that he lacked scienter. The principal argument made by Alston's counsel at trial was that Alston had picked up a rusty piece of metal in the dark and--however it may have gotten into his pocket--Alston had not been aware that it was a gun. It is common ground that the defendant's knowledge that he possesses a weapon is an element of a crime. And surely the cosmetic improvements to the weapon--removal of rust, cleaning of the gun and some restoration of the handle-- tended to make it more readily recognizable as a firearm. Alston's story might be especially hard to believe if the jury thought that the object at the time Alston picked it up was the cleaned-up and repaired weapon received in evidence at his trial. Nevertheless, Alston has an uphill case under Rule 403. The gun was of great relevance to the prosecution; its possession was a critical element in the crime, and the failure to offer into evidence the gun allegedly seized from Alston would have been difficult to explain. As to -7- -7- prejudice, nothing prevented Alston from offering evidence, through the government's own witnesses, that when seized, the gun had been in completely different shape (rusted, pitted, and with electric tape around the handle). In fact, the prosecutor brought out most of this information himself on direct examination. The Boston police expert who first examined the gun testified that the weapon--recognizable as a handgun in its original state--had been in "a severe rusted condition" and was "totally brown from rust"; that the slide "would not move because it was rusted solid"; that parts were missing including the magazine and the grips around the handle; and that the handle was wrapped in tape. Then ATF agents testified as to the cleaning and test firing, which can be done without a magazine simply by chambering a bullet. Where the district court declines to exclude evidence under Rule 403, we reverse only where the district court has abused its discretion. United States v. Cruz-Kuilan, 75 F.3d _____________ ___________ 59, 61 (1st Cir. 1996) (district court's Rule 403 decision stands absent "extraordinarily compelling circumstances"). Here, the evidence sought to be excluded was patently relevant and important, while testimony about the prior condition of the gun was available to mitigate prejudice, although not wholly to eliminate it. The district court did not commit reversible error. -8- -8- More interesting is Alston's suggestion that the government violated due process requirements by deliberately altering evidence that, in its original form, might have helped to exculpate Alston. The government says that bad faith is required for a successful due process claim, citing us to case law suggesting that good faith destruction of exculpatory evidence by the government does not violate due process. See Arizona v. Youngblood, 488 U.S. 51, 56-58 ___ _______ __________ (1988); California v. Trombetta, 467 U.S. 479, 488-89 (1984). __________ _________ Compare People v. Newberry, 652 N.E.2d 288, 292 (Ill. 1995). _______ ______ ________ Here, no basis exists for a charge of bad faith or negligence. To see if the weapon had been used in other crimes was simply good police work. And the test firing, so long as the unjamming and rust removal were admitted, properly helped to confirm that the gun was "designed" to expel a bullet by explosion. The only disadvantage of which Alston might fairly complain is that the cleaning and repair work tended to undermine his scienter argument; and there is no reason to think that the ATF anticipated the scienter defense. We are not prepared to say that the government's "good faith" is always and everywhere a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant. The genre involves the conflicting interests of law -9- -9- enforcement and the protection of defendants; there is a vast kaleidoscope of different possible situations, varying in conduct, motive, justification and effect. It would be surprising if a single rubric or rule provided a mechanical solution to such dilemmas. The due process standard, when no more specific provision of the Bill of Rights governs, is one of "fundamental fairness." Trombetta, 467 U.S. at 485. _________ Where law enforcement and criminal procedure are at issue, the courts have been willing to examine closely any substantial threat to the fairness of the trial process. E.g., Brady v. Maryland, 373 U.S. 83, 87-88 (1963). At the ____ _____ ________ same time, we are talking about a constitutional constraint: ______________ however phrased, the threshold for courts to intervene is fairly high. See Rochin v. California, 342 U.S. 165, 172-73 ___ ______ __________ (1952).  In the present case, it is enough that the government's alteration of the evidence did not significantly impair Alston's ability to present a legitimate scienter defense. As already indicated, Alston was free to present evidence to give the jury a reasonably effective picture of what the weapon looked like before it had been cleaned and restored; and, as noted, most of this evidence was brought out by the prosecutor. Yes, disputes might exist as to just how much rust or tape had been removed; but we are talking about overall fairness and not perfection. -10- -10- In his brief in this court, Alston appears to be suggesting a different objection to the government's alterations, namely, that by cleaning the gun and freeing the slide, the government made the weapon a more menacing object; and this in turn implied that Alston's possession of the gun presented a greater threat to public safety than the rusted and frozen weapon actually created. It may well be that the cleaned-up, working weapon gave the prosecutor a psychological edge. Yet Alston was not charged with being a danger but with being a felon in possession of a firearm. The defendant cannot ask the jury to nullify the law, whether by interpolating an element that does not exist or otherwise. See United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. ___ _____________ _________ 1993), cert. denied, 512 U.S. 1223 (1994). By the same _____________ token, we do not think that it is an independent objection to evidence, otherwise properly admissible, that it may incidentally reduce the chance that the jury will nullify the law on its own.  In rejecting Alston's claims, we think it worth adding that trial judges have considerable latitude in handling situations of this kind. Rule 403 aside, the spoliation doctrine--actually several different rules--gives the district court various remedies for seeking to assure that a loss of evidence caused by one side does not unfairly -11- -11- prejudice the other. See Sacramona v. Bridgestone/Firestone, ___ _________ ______________________ Inc., 106 F.3d 444, 447 (1st Cir. 1997). Under such rules, ____ bad faith is not an automatic requirement for relief. Id. ___ Apart from his attack on the government's use and alteration of the gun, Alston has several other arguments relating to trial and sentence. One of them--that no rational jury could conclude that Alston knew that he had a gun--requires no extended discussion. The gun was a firearm under the federal definition, Alston had it in his pocket, and the jury was certainly not obliged to believe the story that Alston thought that the gun was something else. See ___ United States v. Staula, 80 F.3d 596, 605 (1st Cir.), cert. _____________ ______ _____ denied, 117 S. Ct. 156 (1996). ______ Alston also attacks his trial attorney's performance. Normally, we do not consider such claims on direct appeal, because the record has not been developed in the district court. Mala v. United States, 7 F.3d 1058, 1063 (1st Cir. ____ _____________ 1993), cert. denied, 511 U.S. 1086 (1994). But, in this ____________ case, Alston did present such a claim in the district court through new counsel, who supported the claim with a 19-page memorandum; the government responded; and the district court rejected the claim on the merits. Thus, we may consider the claim. United States v. Natanel, 938 F.2d 302, 309 (1st Cir. _____________ _______ 1991), cert. denied, 502 U.S. 1079 (1992). ____________ -12- -12- To establish a Sixth Amendment violation, Alston has to show that his lawyer's performance "fell below an objective standard of reasonableness," and that prejudice resulted because, absent the mistake or mistakes, there is a reasonable probability that the outcome would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, __________ __________ 691-92 (1984); Scarpa v. DuBois, 38 F.3d 1, 8 (1st Cir. ______ ______ 1994), cert. denied, 115 S. Ct. 940 (1995). Alston points to ____________ various alleged mistakes by trial counsel. Even taken together, these mistakes do not satisfy the Strickland __________ standard. The brunt of Alston's ineffective assistance claim is that Alston's counsel, instead of resting after the government presented its case, should have offered several defense witnesses for a theory that the defense had originally proposed. This approach, outlined in defense counsel's opening statement to the jury, was to retell the story about the refrigerator move and then to argue or insinuate that the informant (to secure a reward) probably placed the gun in Alston's coat pocket after Alston had gone inside the house to deliver the refrigerator. Alston had subpoenaed the man who allegedly helped him move the refrigerator, and we will assume that this witness might have confirmed that part of the story. But the notion that the informant planted the gun is pure speculation. -13- -13- Alston now says that at least his trial attorney should have sought disclosure of the informant's name. Government privilege would make this task difficult, see United States ___ _____________ v. Batista-Polanco, 927 F.2d 14, 19-20 (1st Cir. 1991), but _______________ perhaps not impossible if the informant's testimony were likely to be very important to the defense. Roviaro v. _______ United States, 353 U.S. 53, 59, 64-65 (1957). _____________ Still, it is hard to imagine the privilege being overcome where, as here, nothing suggested that the informant had actually planted the gun. Moreover, the district judge knew that in moving to suppress, Alston had himself filed an affidavit indicating that he had picked up the gun after it fell out of the refrigerator. Whether he put it into his pocket immediately or left it on the porch temporarily, the notion of the informant as a deus ex machina was effectively _______________ undermined. There was no likelihood that the court would have required disclosure of the informant's identity. Overall, defense counsel at trial had a very weak hand to play, since Alston was caught in possession of the gun, and his prior felony convictions were easily proved. To rely on the notion that Alston did not know it was a gun was probably a thin reed (although one also grasped by appellate counsel in this court). Nevertheless, the decision to rely on this straightforward defense at trial, rather than complicate it with an even less plausible story about a -14- -14- planted weapon, was a choice well within the discretion of counsel. Alston's last claim of error relates to enhancement of his sentence under 18 U.S.C. 924(e), the three-strikes provision for violent felony convictions. Alston says that due to the passage of time, his civil rights have been restored under Massachusetts law for one or more of the convictions relied upon by the district court to comprise the three prior violent felonies. Under 18 U.S.C. 921(a)(20), a conviction "shall not be considered" where inter alia __________ a person . . . has had civil rights restored . . . , unless such . . . restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms. The district court replied that since the first of the three convictions, Alston has at all times had his civil rights suspended. In other words, as the sentencing judge read the statute, a conviction can still be considered under the three strikes provision, even though enough time had otherwise passed under state law for the restoration of civil rights, so long as the period of disability had been maintained on account of a later conviction. This presents an interesting problem which need not be resolved in this case.  Massachusetts materially restricts an ex-felon's right to carry and traffic in firearms regardless of the passage of time. United States v. Estrella, 104 F.3d 3, 8 (1st Cir. _____________ ________ -15- -15- 1997). In Estrella, we found these limited restrictions ________ trigger the above-quoted "unless" exception to the provision relied upon by Alston as restoring his civil rights. 18 U.S.C. 921(a)(20). Estrella was decided after Alston's ________ sentence and the original briefing, but his reply brief has no effective answer to that decision. Some might think that a 15-year sentence for carrying a rusty and inoperable handgun is excessive where there is no evidence that the defendant was otherwise engaged in crime. Others might point to Alston's long criminal record, not fully related in this opinion. It may help to complete the story by recounting that, at oral argument, the prosecutor told us that Alston had refused a proffered plea bargain looking toward a lesser sentence.  Affirmed. ________ -16- -16-