**UNITED STATES of America**

v.

**Vincent FLOWERS and Roderick Taylor.**

**No. 96–30058–MAP.**

United States District Court,
D. Massachusetts.

Nov. 12, 1997.

Ariane D. Vuono, U.S. Atty.'s Office, for U.S.

Michael J. Cruz, Bernard & Cruz, Springfield, MA, for Vincent E. Flowers.

Johnathan R. Elliott, Sr., Harris, Elliott & Rivera–Scazzafava, Springfield, MA, for Rodrick L. Taylor.

## MEMORANDUM REGARDING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

(Docket Nos. 31 & 41)

PONSOR, District Judge.

### I. INTRODUCTION

Defendants Vincent Flowers ("Flowers") and Roderick Taylor ("Taylor") have moved to suppress evidence seized during a warrantless search of an automobile driven by Taylor on February 1, 1996. They assert that the investigatory stop, which led to the seizure of crack cocaine and a firearm, was not justified at its inception, and that the actions of the Springfield police constituted a *de facto* arrest without probable cause.

Defendants were originally prosecuted in the Massachusetts Superior Court. Judge Bertha D. Josephson, applying the Commonwealth's strict approach to confidential informants, allowed defendants' Motions to Suppress on November 13, 1996. The state charges against defendants were thereafter dropped, and this federal prosecution commenced under 21 U.S.C. § 841. Defendants' Motions to Suppress were referred for a Report and Recommendation to United States Magistrate Judge Kenneth P. Neiman, who recommended that the defendants' Motions to Suppress be allowed. For the reasons set forth below, the court will decline to adopt the Magistrate Judge's recommendation and will deny the defendants' motions.

### II. FACTUAL BACKGROUND

At approximately 12:45 P.M. on February 1, 1996, Springfield police officer Lee received a telephone call from a confidential informant ("CI"). Hearing transcript ("R.") at 17. Although the CI had generally worked with another officer, Officer Lee had also had prior contact with this informant. R. at 13. Lee testified that he knew the CI by name and recognized his voice. This CI had provided reliable information in the past that had led to the seizure of narcotics and guns and had resulted in the convictions of individuals on related charges. R. at 13–17. When questioned as to the CI's reputation for providing credible information, Lee characterized the CI as "one of the better informants that we have." R. at 34.

Lee spoke with the CI for less than five minutes. R. at 17. In the course of that conversation, the CI related that he had observed, in the area of Cambridge Street in Springfield, a brown Acura with tinted windows and Massachusetts registration number 977–YMS, occupied by two black males. R. at 17. The CI described one of the men as being approximately six feet seven inches tall and wearing a Dallas Cowboys jacket. R. at 18. The informant described the other man as being approximately six feet tall with braided hair and wearing a black leather jacket. R. at 18.

The CI told Lee that he observed the two men in possession of a large quantity of crack cocaine and two "nines," a common street term for nine millimeter caliber handguns. R. at 18. The informant stated that the two men were making "drops" (delivering narcotics to street level dealers) in the Mason Square area of Springfield. R. at 19. He also told Lee that he believed that the two men were from California. R. at 18.

Following this conversation, Lee immediately made a general radio broadcast to Springfield police units, conveying the substance of the information provided by the CI. R. at 20. Lee testified that the words he used and the information that he broadcast

were not to be taken by officers in the field as instructions to arrest the two men, but only that the police should be on the lookout for them. R. at 42.

Shortly after this broadcast, Springfield police officer Komosa observed a gold Acura parked at the curb in front of a variety store near the corner of State Street and Cortland Street. R. at 46–47. This location is in the Mason Square area of Springfield. Komosa drove past the Acura and called to confirm the registration number. R. at 47. Komosa testified that he vaguely recalled Lee's radio broadcast mentioning that "this particular car was involved in selling guns and narcotics." R. at 48. Komosa stated that when he first observed the Acura "there appeared to be someone in the car and it looked like there was a couple of people that were coming towards the car from the store. It looked like they were getting in the car as I was passing it." R. at 49. The car bore the same plate number, 977–YMS, provided by the CI.

After receiving confirmation of the registration number, Komosa requested backup. R. at 49. After the Acura pulled from the curb and began heading east on State Street, Komosa got behind the Acura and activated his overhead lights. R. at 51. As he did so, Komosa instructed other police cruisers to converge on and block in the Acura. R. at 52. Komosa then exited his car, drew his gun and commanded the driver of the Acura to shut off the car's engine. R. at 53–54. Using his door as cover, Komosa waited as other officers approached the Acura. R. at 54. Komosa could see two individuals in the front seat of the Acura and at least one individual in the back seat. R. at 54, However, due to the Acura's tinted windows, Komosa could not positively match the car's occupants with the description provided by the CI, nor could he see what any of the occupants were doing. R. at 54.[1]

Two officers, at least one of whom had his gun drawn, then approached the driver's side of the Acura. R. at 55–56. Other officers also approached the Acura, with a total often to twelve police officers and a number of cruisers and unmarked vehicles responding to Komosa's request for backup. R. at 59. Komosa testified that the Acura's three occupants were removed from the car, placed on the ground and patted down. R. at 56–57. Komosa testified that the Acura's occupants were on the ground for no longer than three to four minutes. R. at 57.

Officers Auger and Kennedy arrived on the scene in separate vehicles approximately one minute after receiving Komosa's request for backup. R. at 94, 144. Auger testified that upon his arrival, he observed that the front passenger door of the Acura was open, and that all three individuals were outside the car, already standing and being interviewed by the officers.[2] R. at 95. Auger stated that he went to the passenger side of the Acura, and after positioning his head and upper torso inside the passenger compartment, immediately detected a powerful odor of marijuana. R. at 97. Auger testified that he was searching the passenger's side floor area of the Acura for weapons. R. at 97–98. Auger stated that he then looked up into the area between the Acura's sunroof and its retractable sunscreen and observed a clear plastic bag containing seeds, stems and marijuana, which he then retrieved. R. at 98–100. Auger testified that he also retrieved from the sunroof compartment two more plastic bags containing crack cocaine packaged for street sale. R. at 101–02.

Auger stated that he was assisted in his search by Kennedy. R. at 103. Kennedy testified that he opened the driver's side door and entered the Acura, and also immediately detected a strong odor of marijuana. R. at 150–51. Kennedy stated that he was looking for any weapons that would have been accessible to the passengers in the Acura. R. at 151–52. Although Auger testified that he

---

1. It later emerged that two of the individuals in the car matched the CI's description—one very tall wearing a Dallas Cowboys jacket, the other somewhat shorter in a black leather jacket—though Komosa did not note this fact at the time.

2. The driver of the Acura was identified as Taylor, and the front seat passenger was identified as Flowers. The third individual, occupying the rear seat, was identified as Darnel Jones. Jones was arrested with defendants, but was not subsequently indicted.

retrieved the marijuana "almost immediately," R. at 105, Kennedy stated that "it was a few minutes, maybe two or three minutes," before he observed Auger retrieve items from the sunroof compartment of the Acura. R. at 152. Kennedy then looked into the driver's side area of the sunroof compartment and found a ski cap wrapped around a loaded .45 caliber automatic pistol with an extra ammunition clip. R. at 154–55.

## III. DISCUSSION

The Government urges this court to decline to adopt the Magistrate Judge's Report and Recommendation primarily on the ground that the investigatory stop was justified at its inception and handled in a manner reasonably designed to protect the officers and the public. When this investigatory stop led to the discovery of the aroma of marijuana and marijuana itself, the arrest of the defendants and the further search—the Government contends—were justified. Alternatively, the Government argues that the facts known to the police at the time that the automobile was stopped were sufficient to establish probable cause for an arrest.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that the police may stop and briefly detain a person for investigative purposes even if the officer lacks probable cause. However, the Court cautioned that:

> ... in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

*Id.* at 21, 88 S.Ct. at 1879–80. Further, the Court stressed that the facts must be judged against an objective standard, *i.e.,* asking whether the facts available to the officer at the moment of the search or seizure would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* The level of suspicion required for an investigative stop is less demanding than that for probable cause. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). See also *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304,

87 L.Ed.2d 381 (1985); *United States v. McCarthy,* 77 F.3d 522 (1st Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 479, 136 L.Ed.2d 374 (1996). However, the officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The Fourth Amendment requires "some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984).

In assessing whether a challenged search or seizure is unreasonable, *Terry* mandates a dual inquiry:

> ... whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. *See also McCarthy,* 77 F.3d at 530; *United States v. Stanley,* 915 F.2d 54.

On several occasions, the Court has elaborated upon and attempted to give content to the *Terry* "reasonable or articulable suspicion" standard. For example in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court noted that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* at 417, 101 S.Ct. at 695. In attempting to define the concept of what cause is sufficient to authorize the police to make an investigative stop, the Court stated:

> ... the essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police

reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions.... The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 417–18, 101 S.Ct. at 695.

*Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) offers a helpful analysis of the quantum of proof needed to justify a *Terry* stop. In *White,* a police officer received a telephone call from an *anonymous* person, stating that one Vanessa White would be leaving a particular address at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case. The officer and his partner proceeded to the address specified, where they observed a brown Plymouth station wagon with a broken right taillight in front of the building. The officers observed White leave the building, carrying nothing in her hands, and enter the station wagon. They followed the vehicle as it drove the most direct route to Dobey's Motel. Police stopped the vehicle just short of the motel. Following the stop, the driver gave the officers permission to look for cocaine in the car. The officers discovered a brown attache case, and upon request the driver gave the officers the combination to the lock. The officers discovered marijuana in the attache case and arrested the driver. During processing at the police station, the officers found cocaine in the driver's purse. *Id.* at 325–29, 110 S.Ct. at 2412–16.

In holding that the stop was justified, the Court noted that "reasonable suspicion" is less than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content from that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Id.* at 329, 110 S.Ct. at 2416.

In *White,* although not every detail provided by the informant was verified or even correct, the Court noted that there was substantial corroboration of the informant's tip by the police. This verification included details as to the particular apartment building, the particular vehicle, the time frame, and the future actions of White, which could not be easily predicted, such as her trip to the motel. *Id.*

Although it is a close case, we conclude that under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of respondent's car.

*Id.* at 333, 110 S.Ct. at 2417–18.

■ Here, unlike in *White,* the officers were not employing information from an anonymous source but from a proven, reliable confidential informant known by name and reputation to the officers. The Supreme Court has recognized that with a known, reliable informant police have a stronger justification for an investigatory stop "than obtains in the case of an anonymous telephone tip." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1971). On top of this, most of the key details of the informant's communication were corroborated. A vehicle of the same make and general color, with tinted windows, was found in the area specified, at the time the informant said it would be there, and the license number was an exact match.

Under these circumstances, Officer Komosa certainly had the right, if not the duty, at least to stop the car and direct an inquiry to the driver and passengers. As the Supreme Court stated in *Adams:*

... [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.

*Id.* at 145, 92 S.Ct. at 1922–23. Moreover, Komosa's actions were completely consistent

with decisional law in this circuit governing *Terry* stops. *See, e.g. United States v. Alston*, 112 F.3d 32 (1st Cir.1997) (reasonable suspicion for a *Terry* stop established on the basis of tip provided by a confidential informant when the police confirmed the informant's description of defendant at the specific location provided); *United States v. Young*, 105 F.3d 1 (1st Cir.1997) (*Terry* stop approved where officers saw three individuals, one of whom appeared to match the description of three armed robbers who were spotted in the area, and where one of the individuals walked away as the officers approached the group, and another, upon being questioned, made furtive movements and was observed as having a gun in his waistband); *United States v. Kimball*, 25 F.3d 1 (1st Cir.1994) (vehicle observed at an inappropriate location late at night, officer knew burglaries occurred in similar locations and vehicle was recognized as belonging to an individual with a prior criminal history of burglaries); *United States v. Zapata*, 18 F.3d 971 (1st Cir.1994) (*Terry* stop upheld based upon a reliable informant's tip concerning narcotics related activity only after the suspect was surveilled and observed *engaging* in suspicious activity); *United States v. Stanley*, 915 F.2d 54, 55 (1st Cir.1990) (officer's suspicion found to be reasonable based on both the location and defendant's conduct before and after the officer approached his car).

■ Of course, even when a stop is justified, the Government must show that the actions undertaken by the police at the time were reasonably related to the circumstances justifying the stop. On this point, the rule is—superficially at least—quite simple. Once the officer has reasonable grounds to make the stop, and has reason to believe the suspect may be armed and dangerous, he may conduct a limited weapons search in order to permit the officer "to pursue his investigation without fear of violence...." *Adams*, 407 U.S. at 146, 92 S.Ct. at 1923.

This weapons search may be rather intrusive without constituting an arrest. In *Terry* itself, for example, the officer spun the individual around, patted him down preliminarily and (after feeling a gun but not being able to grasp it) ordered him and two associates into a nearby store. *Terry*, 392 U.S. at 7, 88 S.Ct. at 1872. He then took out his revolver and ordered all three to raise their hands and face the wall while he patted down their outer clothing more carefully, at which point he removed the gun from one suspect and found a second weapon on another. *Id.*

■ Comparing the *Terry* facts with this case, it is obvious Komosa did not require probable cause to arrest before drawing his revolver and ordering Taylor to turn off the car's engine. A more casual approach, given the information he had, would have been unprofessional and perhaps even foolhardy. The back-up officers were similarly justified in removing the defendants from the car and placing them on the ground briefly for a weapons patdown, as part of the investigative stop. Most significantly, Officer Auger was justified in poking his head and torso into the car's passenger side to make a limited inspection for weapons that might be accessible to the defendants standing nearby, in order to insure the safety of the officers and of bystanders on the public street. None of these searches exhibited the indicia of a more intrusive and more thorough search for evidence of a crime. The goal was simply to ensure safety. Of course, once the officer detected a powerful aroma of marijuana, and saw the contraband in plain view, he was entitled to search the vehicle. *U.S. v. Staula*, 80 F.3d 596 (1st Cir.1996). The fruits of this search, the marijuana, the crack cocaine and the firearm, are therefore fully admissible.

■ The defendants' argument that the actions of Komosa and the other officers constituted a *de facto* arrest, for which probable cause would have been required from the first contact, is not persuasive. As the First Circuit has noted, no "mechanical checklist has been assembled" to assist judges in distinguishing between an investigative stop, which does not require probable cause, from a detention that is equivalent to an arrest, which does. *U.S. v. Quinn*, 815 F.2d 153, 156 (1st Cir.1987). Certainly, the use of guns and the presence of more than one police officer do not make a *Terry* stop

an arrest. *U.S.v. Maguire*, 918 F.2d 254, 259 (1st Cir.1990).

The facts of this case are similar to those presented in *U.S. v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), where the officers made a roadside investigative stop of a truck carrying marijuana. In weighing the effect of the twenty-minute duration of the stop, the Court emphasized that trial judges should "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* at 686, 105 S.Ct. at 1575. The central question is whether the police "pursued a means of investigation that was likely to confirm or dispel their suspicions quickly...." *Id.* Here, the officers made the stop, quickly checked the defendants and the vehicle for accessible weapons, and obtained probable cause for the arrest within three or four minutes at the most. Under these circumstances, a reasonable person would have believed he was being briefly detained for inquiry or investigation, not arrested. The detention was therefore not the equivalent of an arrest, and probable cause was not required.

Given that the investigatory stop was permissible from its inception under *Terry* and its progeny, was performed in a reasonably limited manner consistent with the safety of the officers and the public, and promptly led to the discovery of evidence providing probable cause for the further search of the car and the arrest of the defendants, it is unnecessary for the court to address the Government's alternative argument, that the informant's communication (as corroborated by Komosa's observations) provided probable cause for arrest in any event.

## IV. CONCLUSION

For the foregoing reasons the court hereby declines to adopt the Report and Recommendation of the Magistrate Judge. The defendants' motions to suppress are hereby DENIED.